OAKES AMES & another, Executors, *vs.* LAKE SUPERIOR & MISSISSIPPI RAILROAD COMPANY.

Jan. 11, 1875.
On Re-argument, Oct. 12, 1875.

**Constitution of State—Creation of Corporations by Special Acts—Amendment of Territorial Charters.**—Upon the first argument in this case, *Held*, that the act of March 8, 1861, assuming to amend the charter of the Nebraska & Lake Superior Railroad Co., (Laws 1857, ex. sess., ch. 93,) by constituting certain persons, (seventeen in number, and three of whom were among the twenty-six corporators named in the act of 1857,) a corporation under the name of The Lake Superior & Mississippi Railroad Co., is repugnant to § 2, art. 10, of the state constitution, which provides that "no corporations shall be formed under special acts, except for municipal purposes."

Upon re-argument, *Held*, overruling the former decision, that the act of the legislature of March 8, 1861, entitled "An act to amend an act entitled an act to incorporate the Nebraska & Lake Superior Railroad Company," is constitutional.

**Eminent Domain—Tribunal to assess Compensation of Land Owner need not be a Jury.**—In proceedings under the right of eminent domain to take private property for public use, while the legislature must provide an impartial tribunal to assess the compensation to be paid, and an opportunity to the parties interested to be heard before it, it may determine what that tribunal shall be, whether a jury, a court without a jury, or commissioners to be appointed by the court.

Plaintiffs brought this action in the court of common pleas for Ramsey county, to restrain the defendant from entering upon land of the plaintiffs in that county, and constructing its railroad thereon. In their complaint, they allege that the defendant is a corporation organized under the general railway law of the state, and also assuming to act as a corporation, under and by virtue of the special legislation hereinafter mentioned. The defendant, in its answer, asserts its right to take the plaintiffs' land for the purpose of its road, by virtue of such special legislation, and of proceedings for condemnation duly taken as therein provided.

At the trial, before *Hall*, J., it was admitted that the land in question was necessary for the purposes of defendant's railway, that the plaintiffs claimed no relief on the ground that the defendant entered upon their land before securing

compensation, and that the defendant claims no corporate rights, except under the special legislation hereinafter mentioned. It was further admitted that in the year 1857, Minnesota extended to the Missouri river, and Nebraska from the Missouri river to the Rocky Mountains; that Nebraska extended as far north as, and farther south, than Minnesota; that Cheyenne City was one degree north of Duluth, at the junction of the Cheyenne river and the Red River of the North. The special legislation under which defendant claims is as follows:

On May 23, 1857, the legislative assembly of the then Territory of Minnesota passed an act entitled " An act to incorporate the Nebraska & Lake Superior Railroad Company," (Laws 1857, ex. sess., ch. 93,) in which it is enacted as follows:

" SEC. 1. That Erastus Corning and Edward C. Delavan, of Albany; John F. Seymour and Ward Hunt, of Utica; Sam. F. Butterworth, Guillaume Merle and John F. Butterworth, of New York; Daniel Tyler, of Connecticut; Benjamin W. Raymond, Chicago; Edward Martindale, New Jersey; Lowell Holbrook and Anson Blake, of Brooklyn, and William B. Jackson, Remsin, New York; Sumner J. Smith and Edmund F. Ely, Minnesota Territory; Edmund Rice, Alexander Wilkin, Franklin Steele, Reuben H. Carleton, W. W. Kingsbury, Thomas Clark, 2nd., Benjamin Thompson, S. B. Abbe, S. B. Lowry, Joseph R. Brown, and J. S. Watrous, and their associates, successors and assigns, be and they hereby are constituted a body corporate and politic, by the name and style of The Nebraska and Lake Superior Railroad Company, and by that name and style shall be capable in law of taking, purchasing, holding, leasing, selling, mortgaging and conveying real estate and property, whether real, personal or mixed, so far as may be necessary or convenient for the purposes hereinafter mentioned, and in their corporate name may sue and be sued, plead and be impleaded, contract and be contracted with, and may have a common seal, which they may alter or renew

at pleasure, and may have and exercise all powers, rights, privileges and immunities which are or may be necessary or convenient to carry into effect the purposes and objects of this act, and of the said corporation.

"Sec. 2. The said corporation is hereby authorized and empowered to survey, locate, construct, maintain, use and operate at pleasure, to alter the line thereof, without changing the eastern terminus, a railroad, with one or more tracks or lines of rails, to commence at some convenient point or place (within the Territory of Minnesota) at the west end of Lake Superior, or on Superior Bay, in said territory, or on the Bay of Saint Louis, in the Territory of Minnesota, and running thence westerly, within said territory, *via* Cheyenne City, to the Nebraska line, or such route as the corporators may deem most expedient, with a branch from some point east of the Mississippi to the Wisconsin state line at Taylor's Falls, together with all proper stations, depots, turn-outs, engines, cars, and other appurtenances and furniture of a railroad.

"Sec. 3. The capital stock of said corporation shall be ten millions of dollars, and shall be divided into shares of one hundred dollars each," etc.

"Sec. 4. The above named persons, or one-fourth of them, are hereby authorized to open books for receiving subscriptions to the capital stock of said company, which books may be opened at such times and places as a majority of said corporators may determine ;  *  *  *  said books may be kept open thirty days, or until the sum of three hundred thousand dollars of the capital stock of said company shall be subscribed. And as soon as said sum of $300,000 shall have been subscribed to the capital stock of said company, and five per cent. of the amount so subscribed paid in,  *  *  *  the above named persons, or a majority of them, may give like notice of a meeting of the stockholders, at such time and place as they may deem expedient, to choose directors," etc.  Sec. 5 prescribes certain powers and duties of the board of directors.

" SEC. 6. The said corporation are hereby authorized and empowered to cause such surveys and examination to be made as shall be necessary to ascertain the most advantageous route whereon to construct the railroad ; and to cause estimates to be made of the probable cost thereof. Said road shall be surveyed and located to Nebraska in three years ; work shall be commenced on at least one hundred miles of the easterly section thereof in three years, and shall be completed to the Mississippi river and to Taylor's Falls in not exceeding eight years, from the passage of this act."

Sec. 7 authorizes the company to build its railroad across highways and navigable streams.

Sec. 8 gives the company a right of way to the width of two hundred feet, and the right to enter upon lands, etc.

Sec. 9 prescribes the proceedings to be taken by the company for the taking of private property for the purposes of its railroad, and contains the usual provision for a trial by jury, on appeal from the award of the commissioners.

Sec. 10 gives the corporation the power to consolidate with any other company having the same general direction or location, etc.

Sec. 11 authorizes the company to borrow money, and execute bonds, mortgages, etc.

Sec. 12 provides that lands granted by congress may be granted directly to the company, etc.

Sec. 13 gives the right to pass over connecting railroads, etc.

Sec. 14 provides that the company shall, if required, carry the United States mail.

Sec. 15 provides a penalty for wilful injury to the railroad.

Sec. 16 provides that conductors, etc., shall wear badges.

Sec. 17 provides that every locomotive shall carry a bell, which shall be rung, etc.

" Sec. 18. This act is hereby declared to be a public act, and may be amended by any subsequent legislative assembly, in any manner not destroying or impairing the vested rights of said corporation.

"Sec. 19. The said company shall give notice in writing to the governor of said territory, on or before the first day of January, 1858, of their intention to proceed under the provisions of this act, and in case of their failure to give such notice, this act, and all the powers herein granted, shall become null and void."

Prior to January 1, 1858, eighteen of the corporators above named notified the governor of the territory of their acceptance of the charter, and of their intention to proceed under its provisions. This notification bears date September 12, 1857, and was filed in the office of the secretary of the territory, on December 26, 1857.

It does not appear that the above named corporators, or any of them, ever took any further step to carry out the purposes of the act.

Minnesota was admitted into the Union in 1858, with a constitution which provides, art. 10, § 2, that "no corporations shall be formed under special acts, except for municipal purposes."

On March 8, 1861, the legislature of the State of Minnesota passed an act entitled "An act to amend an act entitled an act to incorporate the Nebraska and Lake Superior Railroad Company," (Sp. Laws, 1861, ch. 1,) in which it is enacted as follows:

"Section 1. That the act of the territorial legislature of Minnesota, entitled an act to incorporate the Nebraska and Lake Superior Railroad Company, approved May 23, 1857, be and the same is hereby amended and continued so that it shall read as follows: That Lyman Dayton, John McKusick, Henry A. Swift, Richard Chute, Dwight Woodbury, C. T. Stearns, Thomas Clark, Levi Butler, Sidney Luce, E. O. Hamlin, A. F. Hawley and A. G. Chatfield, of the State of Minnesota, Anson Blake, Erastus Corning, Orville Clark, of the State of New York, Eber B. Ward and A. H. Hanchett, of Michigan, and their associates, successors and assigns, be, and they are hereby constituted a body corporate and politic, by the name and style of 'The Lake Superior

and Mississippi Railroad Company,' and by that name and style shall be capable in law of taking, purchasing, holding, leasing, selling, mortgaging and conveying real estate," etc., the remainder of the section following the language of § 1 of the act of 1857.

"Sec. 2. That said corporation is hereby authorized and empowered to survey, locate, construct, maintain, use and operate, and at pleasure to alter the line thereof, a railroad, with one or more tracks or lines of rails, to commence at some convenient point or place, within the State of Minnesota, at the west end of Lake Superior, and running thence, by the most feasible route, within this state, to some point on the Mississippi, with the right to extend the same to the Minnesota river, and also with the right to construct a branch from the main line to the navigable waters of the Saint Croix, together with all proper stations, depots, turn-outs, engines, cars, and other appurtenances and furniture of a railroad: *Provided*, that said company shall commence the grading and construction of said road at Superior, and continue the construction thereof toward the Mississippi river, and shall first build their said main line to said Mississippi river.

"Sec. 3. The capital of said corporation shall be five millions of dollars, and shall be divided into shares of one hundred dollars each, which shall be deemed personal property," etc., (following the language of § 3 of the former act.)

"Sec. 4. The above named persons or any of them are hereby authorized to open books for receiving subscriptions to the capital stock of said company, which books may be opened at such times and places as a majority of said corporators may determine * * * ; said books may be kept open thirty days, or until the sum of one hundred and fifty thousand dollars of the capital stock of said company shall be subscribed. And as soon as said sum of one hundred and fifty thousand dollars shall have been subscribed to the capital stock of said company, and five per cent. of

the amount so subscribed paid in  *  *  *  , the above named persons, or a majority of them, may give like notice of a meeting of the stockholders, at such time and place as they may deem expedient, to choose directors," etc., (following the language of the same section in the former .act.)

Sec. 5 follows the language of § 5 of the former act.

Sec. 6 follows the language of § 7 of the former act, (§ 6 of that act not appearing in this.)

Sections 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 and 17 follow closely the language of §§ 8, 9, 10, 11, 12, 13, 14, 15, 16, 17 and 18, respectively, the changes made being very slight, and, so far as the questions in this case are concerned, wholly immaterial.

Sec. 18 grants swamp lands to the company, on certain conditions.

Sec. 19 provides that the act shall take effect from and after its passage.

On April 13, 1861, a majority of the corporators named in this act met, and voted to accept it, and to take proceedings for the permanent organization of the company, and to give notice of the time and place for opening the stock subscription books of the company, and to use the ·books and form of subscription procured by Lyman Dayton, Esq.  At an adjourned meeting, held May 13, 1861, it was resolved that Lyman Dayton, Esq., be designated as a suitable person to receive the five per cent. to be paid in upon the capital stock subscribed.

By an act approved March 8, 1863, (Sp. Laws 1863, ch. 5,) " The Lake Superior and Mississippi Railroad Company, as organized under the act entitled ' An act to amend an act to incorporate the Nebraska and Lake Superior Railroad Company,' approved March 8, 1861," is allowed further time for the construction of its road.

On March 12, 1864, certain persons, who owned a majority of the stock in the Lake Superior and Mississippi Railroad Company, as organized under the act of 1861, and the proceedings before mentioned, entered into articles of

association, for the purpose of constructing a railroad, and formed themselves into a body corporate, under the general railroad law then in force. In these articles of association, which were filed in the office of the secretary of state, May 13, 1864, the name assumed by the company thus formed is stated to be "The Lake Superior and Mississippi Railroad Company," and the termini of its road are stated to be "at the head of Lake Superior, and at St. Paul on the Mississippi river, in the state of Minnesota." Under these articles, a company was organized, and negotiations were had looking to a consolidation of this company with the company of the same name organized under the act of 1861; but upon the discovery, in the office of the secretary of state, of the notice of acceptance of the act of 1857, this plan was laid aside. The organization of the association formed under the general law was also abandoned, without any further steps having been taken toward the prosecution of the enterprise for which that association was formed.

By an act approved February 23, 1865, (Sp. Laws 1865, ch. 2,) the lands granted by congress to the State of Minnesota, to aid in the construction of a railroad from St. Paul to Lake Superior, are granted and transferred to the Lake Superior & Mississippi Railroad Company, on condition that the whole of its line from St. Paul to the waters of Lake Superior should be completed within five years from July 4, 1865; and by act of March 5, 1867, (Sp. Laws 1867, ch. 5,) this time was extended another year.

By act of March 6, 1868, (Sp. Laws 1868, ch. 8,) § 8 of the act of 1861 was so amended as to authorize the taking of private property by the company, upon payment of the amount awarded by commissioners, whose award should have the same effect as the verdict of a jury. The provisions of this act are fully stated in the second of the following opinions.

On March 28, 1868, the company assuming to be organized under these special acts instituted proceedings, under the act of 1868, for the taking of the land in question, and

between the commencement and the trial of this action, the proceedings were completed, the award of commissioners filed, and the amount awarded to plaintiffs paid into court. No appeal from the award was taken by plaintiffs, and the company went on and completed its road.

Upon these facts, the judge found, as a conclusion of law, "that the defendant was, at the time of the acts complained of, a legally existing corporation, under and by virtue of the legislation above detailed, and as such, and in the construction, and for the purposes of the said railroad from Lake Superior to the Mississippi river, was empowered to condemn private property to its use, by pursuing the methods to that end prescribed in the afore-mentioned acts of the legislature." Judgment was accordingly ordered for the defendant, a new trial was refused, and plaintiffs appealed.

*E. C. Palmer* and *John B. & W. H. Sanborn*, for appellants.

*James Smith, Jr.*, for respondent.

Young, J. By an act of the legislative assembly of the territory of Minnesota, approved May 23, 1857, (Laws 1857, extra sess., ch. 93,) it is enacted (§ 1) "that Erastus Corning" (and twenty-five others named therein) "and their associates, successors and assigns be, and they hereby are constituted a body corporate and politic, by the name and style of the Nebraska and Lake Superior Railroad Company," with the powers, privileges and immunities usually granted in charters of incorporation. The second section provides that "the said corporation is hereby authorized and empowered to survey, locate, construct, maintain, use and operate at pleasure, to alter the line thereof, without changing the eastern terminus, a railroad, with one or more tracks or lines of rails, to commence at some convenient point or place, (within the territory of Minnesota,) at the west end of Lake Superior, or on Superior Bay in said territory, or on the Bay of St. Louis in the territory of Minnesota, and running thence westerly within said territory *via* Cheyenne City to the Nebraska line, or such route as

the corporators may deem most expedient, with a branch from some point east of the Mississippi to the Wisconsin state line at Taylor's Falls, together with all proper stations,'' etc. Section three fixes the capital stock at ten millions of dollars, to be divided into shares of one hundred dollars each.

The concluding sections are as follows : " Sec. 18. This act is hereby declared to be a public act, and may be amended by any subsequent legislative assembly in any manner not destroying or impairing the vested rights of said corporation.

" Sec. 19. The said company shall give notice in writing to the governor of said territory, on or before the first day of January, 1858, of their intention to proceed under the provisions of this act; and in case of their failure to give such notice, this act, and all the powers herein granted, shall become null and void.''

Undoubtedly a very considerable latitude of discretion is given by this charter to the company in fixing the termini and the route of the proposed railroad. It is authorized '' to construct, * * * and at pleasure to alter,'' (for the words should undoubtedly be read in this order,) the line of its road, preserving the eastern terminus, and may choose the route *via* Cheyenne City, " or such route as the corporators may deem most expedient.'' But this discretion is not unlimited. The evident purpose of the act is to provide for a road, wholly within the territory of Minnesota, from Lake Superior to the Nebraska line. The company may reach that line *via* Cheyenne City, which is admitted to be one degree north of Duluth, at the junction of Cheyenne river and the Red River of the North, or by such other route as they may deem most expedient; but any route they may select must be such as will lead, in a westerly direction, to the Nebraska line. The legislative assembly certainly did not intend to authorize the company to build a road to any point they might choose to select, provided it lay west of a north and south line drawn through the terminus at

Lake Superior; and the wide discretion allowed must be exercised in subservience to the general purpose of the grant. The company derived no authority from this act to build any line of railroad, (except the branch to Taylor's Falls on the St. Croix river,) upon a route by which it would be impossible, without going outside the territory of Minnesota, to reach the Nebraska line.

On March 8, 1861, an act was passed by the legislature of the state of Minnesota, entitled "An act to amend an act entitled 'An act to incorporate the Nebraska and Lake Superior Railroad Company,'" (Sp. Laws 1861, ch. 1,) in which it is enacted as follows:

"Section 1. That the act of the territorial legislature of Minnesota, entitled 'An act to incorporate the Nebraska and Lake Superior Railroad Company,' approved May 23, 1857, be and the same is hereby amended and continued so that it shall read as follows: that Lyman Dayton," (and sixteen others who are named,) "and their associates and successors, be and they are hereby constituted a body corporate and politic, by the name and style of the Lake Superior and Mississippi Railroad Company" (continuing in the language of the same section of the act of 1857.)

"Section 2. That said corporation is hereby authorized and empowered to survey, locate, construct, maintain, use and operate, and at pleasure to alter the line thereof, a railroad, with one or more tracks or lines of rails, to commence at some convenient point or place, within the state of Minnesota, at the west end of Lake Superior, and running thence, by the most feasible route within this state, to some point on the Mississippi, with the right to extend the same to the Minnesota river; and also with the right to construct a branch from the main line to the navigable waters of the St. Croix, together with all proper stations," etc.

The third section fixes the capital stock at five million dollars, to be divided into shares of one hundred dollars each. The remaining sections of the act are substantially, and for the most part literally, the same as the corresponding sections in the act of 1857.

The defendant, claiming to derive authority from these statutes, has assumed a corporate organization, and has constructed a railroad between Duluth, at the westerly end of Lake Superior, to the city of St. Paul, on the Mississippi river, on a route the general direction of which is nearly south. By an act passed March 6, 1868, (Sp. Laws 1868, ch. 8,) the act of 1861 was so amended as to authorize proceedings by the company, for the condemnation of land, widely different from those prescribed by the general railroad law of the state, and with no provision for a trial by jury. The defendant proceeded to condemn certain lands of the plaintiffs, in the city of St. Paul, for the purposes of its railway, pursuing the course provided by the act of 1868, and entered upon the land thus condemned, and began the construction of its railway thereupon. This action was brought to restrain the defendant from prosecuting the work it had begun, and from interfering with the plaintiffs' possession of the land.

The defendant in its answer claims that its proceedings were authorized by the acts of 1857 and 1861, and the various acts amendatory of the latter act.

It was found at the trial that a paper, bearing date September 12, 1857, addressed to the governor of the territory, signed by eighteen (being a majority) of the corporators named in the act of 1857, and notifying the governor of the company's acceptance of that charter, and its intention to proceed under it, was filed on December 26, 1857, and remains on file in the office of the secretary of state.

It is objected by the plaintiffs' counsel that this evidence was insufficient to prove a notice by the corporation to the governor, as required by the act of 1857. If it were necessary to determine this question, we are inclined to think that there would be little difficulty in presuming that all the requirements of the charter, in regard to its acceptance by the corporators, were substantially complied with. But in our examination of the principal question in the case, we shall assume that the Nebraska and Lake Superior Railroad

Company became a corporation, and continued to be a corporation, clothed with all the franchises, powers and immunities conferred by its charter, down to the passage of the act of 1861.

It is further insisted by the plaintiffs' counsel that the act of 1857, being a grant of corporate rights and franchises to the corporators therein named, (or at least to those eighteen who signed the notice of acceptance,) was a contract between the state and these corporators, the obligation of which was impaired by the act of 1861. In answer to this position, it is enough to say that the plaintiffs make no claim that any rights of their own, under the contract contained in the charter, have been invaded by the act of 1861; and it is therefore not open to them to attack the constitutionality of the latter act on this ground.

But on May 11, 1858, between the dates of the passage of the two acts we are considering, Minnesota became a State in the Union, with a constitution which provides, (Art. 10, § 1,) that "No corporations shall be formed under special acts, except for municipal purposes," and the validity of the act of 1861 is drawn in question on the ground that it contravenes this constitutional inhibition.

The language of this section has been largely discussed by the plaintiffs' counsel in their printed argument, in which they contend that the word "formed" has a meaning different from that of "created," and that the effect of this provision is to prohibit the formation, after the adoption of the constitution, of a corporation, by persons authorized by a special act of the territorial legislature to become a corporation. But we think the natural and obvious meaning of this section is that no corporations shall be *created under* special acts; and this construction would of course preclude the creation of corporations *by* special acts.

We have assumed, in accordance with the position taken by the defendant, that the Nebraska & Lake Superior R. Co., as incorporated by the act of 1857, continued in existence, and in the possession of all its corporate franchises,

powers and immunities, down to the passage of the act of 1861. If such were not the fact, then the corporation provided for by the act of 1861 was, beyond any question, an entirely new corporation; and the act by which the legislature attempted to create such corporation was clearly void.

There is no evidence that any further proceedings beyond the acceptance of their charter were ever taken by the corporators named in the act of 1857, or by the corporation itself. The corporation was never organized by the choice of officers, nor was any stock ever issued, down to the date of the passage of the act of 1861. That no stock had ever been issued, or any organization effected, under the act of 1857, is apparent upon an examination of section 4 in the act of 1857 and the corresponding section in the act of 1861. The first company was to be organized when stock to the amount of $300,000 was subscribed, and five per cent. thereof paid in, whereupon the subscribers to the stock were to meet and choose directors. The second company was to be organized in like manner upon a subscription of $150,-000, and payment of five per cent. At the first meeting of the corporators named in the latter act, (April 13, 1861,) it was voted to accept the act, to take proceedings for permanent organization, to give notice of the opening of books for receiving subscriptions to stock, to open and use the books and form of subscription prepared by Lyman Dayton, Esq. ; and at the adjourned meeting, May 13, 1861, Mr. Dayton was designated to receive the five per cent. to be paid on subscriptions. It also appears that, so late as the year 1864, the notice of acceptance of the charter of 1857 had not been found ; that in that year steps were taken by a majority of the defendant's stockholders toward an organization under the general railway law, and a union of the defendant company with the company thus organized, these proceedings being abandoned upon the subsequent discovery of the notice. These facts leave no room for any presumption that, prior to the passage of the act of 1861,

the corporators therein named were possessed of the rights of the original corporators named in the act of 1857, and in fact constituted that corporation. And we do not understand that the defendant makes any such claim. At the trial, it disclaimed any corporate rights, except under these and subsequent amendatory acts; and in the argument in this court, it was not contended that the rights of the corporators in the act of 1857 had been in any manner transferred to the corporators named in the act of 1861, prior to the passage of that act. We need not consider, therefore, whether the latter could, prior to the passage of the act of 1861, have acquired the rights of the former corporators, except by a subscription to, or purchase of, stock, in the first company.

On March 8, 1861, therefore, the Nebraska & Lake Superior Railroad Company was composed of the twenty-six corporators named in the charter; or, in any event, its membership comprised the eighteen who signed the notice of the acceptance of the charter. But three of these twenty-six, and of the eighteen but two, are named as corporators in the act purporting to amend their charter; nor does it appear that the corporation, or any of its corporators, except these three, applied for or accepted the act of 1861.

The eighteenth section of the act of 1857, already quoted, provides for its amendment, by any subsequent legislative assembly, in any manner not destroying or impairing the vested rights of the corporation. It is not easy, nor in this case is it necessary, to define with accuracy the extent of the alterations which, in the exercise of such a reserved power as this, the legislature may make in the charter of a company, and to which the company will be bound to conform. Laying aside the proviso saving vested rights, and assuming the power of amendment to be untrammelled by any such restriction, still this power must somewhere have a limit. Under the pretence of amending its charter, the legislature cannot compel a company to embark upon a new enterprise, radically and essentially different from that con-

templated in the original grant of corporate franchises. If a company is incorporated for the purpose of building a railroad from Lake Superior westerly to Nebraska, the legislature cannot, in the exercise of this reserved power of amendment, so change the charter as to compel the company to build and operate a railroad from Duluth almost due south to St. Paul, under penalty of the loss of its original franchises. Still less can the legislature, by such an amendment, compel the substitution of the one enterprise for the other. See *Zabriskie* v. *Hackensack & N. Y. R. Co.*, 18 N. J. Eq. 178, 192. The act of 1861, therefore, not having been accepted or assented to by the original corporation, or by its corporators, was inoperative to compel the Nebraska and Lake Superior Railroad Company to build a railroad from Lake Superior to St. Paul, on a route which manifestly does not lead, in a westerly direction, toward the Nebraska line as it existed in 1857, or at any time since, or to deprive that company of the right to build a railroad westerly to Nebraska, or to deprive the corporators of that company of their franchise to be a corporation.

After the passage of the act of 1861, therefore, and the organization of the defendant under it, there still existed the Nebraska & Lake Superior Railroad Co., a corporation empowered to build and operate a railroad from Lake Superior westerly to Nebraska, but with no power, and under no duty, to build a railroad from Duluth to St. Paul, and also, (if the act of 1861 is of any validity,) the corporation now defendant, the Lake Superior & Mississippi Railroad Co., with no power to build a road from Lake Superior to Nebraska, but with full power (as it claims) to build and operate the road which it has constructed between Duluth, at the west end of Lake Superior and St. Paul.

In appearance, at least, these are two distinct and independent corporations, with franchises and powers essentially and radically different. They resemble each other in this, that each is a railroad corporation, and the provisions of the two charters prescribing the mode of obtaining subscriptions

for stock, the mode of organization, and the powers and duties of the officers, the manner in which the road may be located, and the right of way obtained by condemnation of property, and certain other provisions of the two charters, are the same. They resemble each other as much as and no more than would two companies organized under the general railroad law, the one for the purpose of building a road from Lake Superior to Nebraska, and the other for the purpose of building a road from Duluth to St. Paul. They differ in name, in the corporators who compose them, in the route of the railroads they may construct, in the nature and object of the enterprises they are empowered to undertake. The two companies certainly appear to be two separate and independent corporations, as distinct in all essential characteristics as any two railway companies can be which are created under the laws of the same state, and whose roads are located in the same state, and have one terminus in common.

It is not denied that very considerable change may be made in the charter and the membership of a corporation, without destroying its identity. The membership of a corporation aggregate is continually changing as shares are transferred by one person to another, the corporation remaining the same. A corporation may, by authority from the legislature, (in the absence of any constitutional restriction upon the power of the legislature in this particular,) and with the assent of the shareholders, engage in new enterprises, foreign to those contemplated in the original charter, without becoming a new corporation. The name of a corporation, like that of an individual, may be changed without destroying its identity.

It is unnecessary to determine in this case whether the legislature, in 1861, might have granted to the Nebraska & Lake Superior Railroad Company the franchise of building and operating a railroad from Duluth to St. Paul, and of taking private property for the purposes of such road, the company, in respect of this new line of road, to possess all the powers granted by the charter in respect of the road

17

originally authorized, however these powers might exceed those granted by the general railroad law to corporations organized thereunder. This would be the grant to an existing corporation of a franchise which might be held by an individual, (*McRoberts* v. *Washburne*, 10 Minn. 23,) and in the strictest use of language could not be said to create a corporation. See *Railroad Co.* v. *Harris*, 12 Wall. 65. But all franchises, when conferred upon a corporation, become *corporate* franchises; and while the franchise *to be* a corporation is, in one sense, the *essential* franchise of a corporation, that by which it is, and without which it cannot be, yet this franchise of mere existence, essential though it be, is one which is of little if any value in itself. The franchise to be a corporation, without the right to build a railroad or engage in any other business whatever, to hold property or to do any corporate act, would be a very insubstantial right, and one which, so far as we know, has never been applied for or granted. But as the whole value of a corporate charter consists in the power it confers, not merely to be a corporation, but, as a corporation, to accomplish certain purposes in the manner authorized therein, it has been held that the prohibition to *create* corporations by special act implies a prohibition to confer by special act, upon a corporation already existing, franchises and powers materially different from those granted by its charter. Thus, in *Ex parte Pritz*, 9 Iowa, 30, upon the construction of a clause in the constitution providing that "the general assembly shall not pass local or special laws  *  *  *  for the incorporation of cities and towns," it was held that the legislature could not, by special act, amend a city charter which was in existence before the adoption of the constitution. In the language of Wright, C. J., "To say that the legislature may not pass a law to *incorporate* a city, but may to amend an act of incorporation already in existence before the adoption of the constitution, or chartered under the general law, would make this provision of the constitution practically amount to nothing. For if they amend, they may to the extent of passing an

entire new law, except as to one section, or they may at one session amend half the law, and at the next the other half, and thus the plain and positive prohibition of the fundamental law would be evaded. By such a construction, the evil sought to be remedied would be continued in a more objectionable form. * * * Suppose the legislature had passed an act amending the act incorporating the city of Davenport, in which every section was changed, except one; or suppose all but the first section had been stricken out, and an entire new law had been substituted, would it be claimed that this would not be an infringement upon the prohibition contained in this section under consideration? And yet, if the power to amend is not withheld, we see no limit to the power to amend. If one section or one line may be amended, then every section and every line may be." pp. 33, 34.

On the other hand, it was held in *California State Telegraph Co.* v. *Alta Tel. Co.*, 22 Cal. 398, under a constitutional provision that "no corporation shall be created by special act, except for municipal purposes," that, by this provision, "the legislature was not directly or impliedly prohibited from granting to a corporation already in existence, and created under the general laws, special privileges, in the nature of a franchise, by a special act." This doctrine, it is evident, would open an easy way of escape from constitutional restraints. In an earlier case, (*Low* v. *City of Marysville*, 5 Cal. 214,) it was held that "as it would have been in violation of the constitution to create a corporation by special act, for other than municipal purposes, it follows that it would be equally unconstitutional to confer special power on a corporation already created. In other words, it would be doing by two acts that which the legislature could not do by one; and corporations for almost every purpose might be created by special act, by first incorporating the stockholders as a municipal body." And in a very recent case, the supreme court of California has reconsidered the doctrine of the case of *California State Tel. Co.* v. *Alta Tel. Co.*, has carefully reviewed the au-

thorities on which it was decided, and has pronounced it to be without foundation in principle or authority. Crockett, J. delivering the principal opinion, says: " In the annals of American jurisprudence that case stands alone, as the sole exponent of the proposition which it enunciates;" and of the case of *Ex parte Pritz*, says: " The reasoning of the supreme court of Iowa, however, is conclusive on the point that, under our constitution, the legislature cannot either amend the charter of an existing corporation, or confer upon it powers and immunities not granted by the general law." *San Francisco* v. *Spring Valley Water Co.*, 48 Cal. 493; and see *Atkinson* v. *M. & C. R. Co.*, 15 Ohio St. 35 ; *State* v. *Cincinnati*, 20 Ohio St. 18.

But whether the grant, to an existing corporation, of new corporate franchises, powers or immunities, different from those enjoyed by corporations organized under the general law, would or would not be an infringement of the constitutional provision prohibiting the formation of corporations under special acts, it must be conceded that a corporation is formed under a special act when the individuals forming the corporation derive their franchise to be a corporation wholly from such special act ; and when the legislature, *uno flatu*, grant to persons, who are not already a corporation, the franchise to be a corporation, under a name not possessed by any existing corporation, and grant to these persons, in their corporate character, the franchise, not already possessed by any corporation or person, of building and operating a specified line of railway, it would seem to need no argument to prove that by such a grant a new railway corporation is called into existence.

If the act in question, therefore, had been an independent and substantive act, granting to the persons therein named the franchise to be a corporation, and proceeding as in the act of 1861, there would be no room for doubt that such an act, if permitted to operate according to its terms and its true intent and meaning, would have created a new corporation. Does it make any difference that the act in question

purports not to be an independent act, but to be auxiliary to, and an amendment and continuation of, the charter of 1857?

If an act had been passed purporting to amend the act of 1857, by adding to it certain provisions incorporating the persons named in the act of 1861, under the name of the Lake Superior & Mississippi R. Co., and granting to such corporation all the powers and immunities claimed by the defendant under the act of 1861, it would be very evident that this so-called amendment of the charter of the Nebraska and Lake Superior Railroad Company was really a new charter, creating a new corporation, under a new name, as much so as if the act of 1861 had, by the two first sections, provided that certain persons should be a corporation, with power to build the railroad the defendant has built, and had then provided that such corporation, in the prosecution of the enterprise for which it was chartered, should possess all the powers and privileges, and be subject to all the restrictions and limitations, granted to or imposed on the Nebraska and Lake Superior R. Co. by the act of 1857. This mode of importing the provisions of the charter of one company into that of a company subsequently created, was formerly common in New York; but it was never claimed that the two corporations thereby became identical.

If the amendatory act had proceeded to repeal the first and other sections of the act of 1857, it is difficult to conceive wherein such an amendment would differ from an original and independent act containing the same provisions. It would have been, in substance and effect, a repeal of the charter of the former company and the creation of a new corporation.

In the case at bar the amendment has been made in a different form. Instead of repealing in terms the two first sections of the act of 1857, and adding to the act a provision incorporating the persons therein named, under the corporate name of the Lake Superior and Mississippi R. Co., the former act " is hereby amended and continued so as to read

as follows :'' and, in section one, new corporators and a new corporate name are substituted for the individual and corporate names in the original act, which are dropped ; and in the second section, the authority to build a road from Lake Superior to Nebraska is omitted, and, in its place, is inserted a grant of authority to build a road from Lake Superior to the Mississippi river ; but the effect, and the only effect, to be given to an amendment made in this form, is that the portions of the original act which are omitted, are repealed, and the substituted sections are enacted for the first time on the passage of the amended act in which they appear.   The effect of this amendment is not to make the persons named in the amended act corporators in the Lake Superior & Mississippi R. Co., and that company a corporation, from the date of the passage of the original act ; but these persons are for the first time constituted a corporation by the substituted section.   This is the rule for construing amendments, in this form, of laws strictly so-called, (*Kerlinger* v. *Barnes*, 14 Minn. 526,) and the reason of the rule obtains with greater force in the case of acts like these in question, which, although in form and popular acceptation laws, are in fact, so far as they confer franchises, merely legislative grants.   If the legislature had granted an estate in fee in land to A, to be used for certain purposes, and had afterwards amended the act by substituting for the grant to A the grant of a like estate, in a different piece of land, to B, to be used by him for the same purposes, whatever might . be the effect of this amendment on the rights of A, it is very clear that the grant to B would be a new and original grant, creating a new estate in no way connected with that before vested in A ; and there is no reason why the grant of a franchise, which is an incorporeal hereditament, should, in this particular, receive a different construction from the grant of an estate in land which is a corporeal hereditament.

Were it not that important pecuniary interests, as well as the validity of an act of the legislature, are involved in this case, we might well have been content to rest our con-

clusion, that the act of 1861 in effect creates a new corporation, upon the mere terms of the act itself. The first section, already quoted, reads that "Lyman Dayton * * * *are hereby constituted* a body corporate and politic by the name and style of the Lake Superior and Mississippi Railroad Company." The act *purports* to create a corporation, and not to confer new powers on a corporation already existing. And the act has the very effect, (if it be valid,) which its terms import. Before its passage, the persons named in it were not a corporation for any purpose, nor was there any corporation in existence, or authorized to come into existence, by the name of the Lake Superior and Mississippi Railroad Company, nor any corporation, under any name, with power to construct a railroad from Duluth to St. Paul. But upon the passage of the act, and its acceptance by the corporators named in the first section, these corporators became (as defendant claims) a corporation, under the name of the Lake Superior and Mississippi Railroad Company, with power to build and operate a railroad from Duluth to St. Paul. The act calls into existence an artificial being, a corporation, which did not before exist, and this is clearly the creation of a corporation. And if the act creates a corporation, it is equally within the constitutional prohibition whether it be an original act, or an amendment to a former special act passed before the constitution was adopted. In either case, a new corporation is created by special act, within the plain meaning of the prohibition in the constitution. No one would seriously contend that the act of 1861 would be valid, if enacted as an amendment to the general railroad law. The objection to it would be that, though called a general law, it was, in reality, a special act by which a corporation was created; and it is open to the same objection, and the objection must be equally fatal to its validity, when enacted in the form of an amendment to another special act.

Of the cases cited by the defendant's counsel, the first, (*New Central Coal Co.* v. *George's Creek Coal Co.* 37 Md.

537,) was a case where, by special act, a charter was granted to three corporators prior to the adoption of a constitution containing a prohibition similar to that we are now considering; but the corporation was not organized until after the constitution went into effect. Subsequently an act was passed changing the name of the company, which organized and went into operation under the new name. The court held (what is not in question in this case) that the right of the corporators to accept the charter, and to become a corporation, was not taken away by the adoption of the constitution, and that the act changing the name of the company was not obnoxious to the constitutional inhibition.

*People* v. *Marshall*, 1 Gilman, 672, cited by both parties, was a *quo warranto* against the Bank of Illinois. This bank was chartered by special act of the territory of Illinois, in 1816. In 1818, a state constitution was adopted, containing the following provision: "There shall be no other banks or monied institutions in this state but those already provided by law, except a state bank and its branches, which may be established and regulated by the general assembly of the state, as they may think proper." In 1835, and prior to the expiration of the territorial charter, that charter was extended for twenty years; and in 1837, the capital stock was increased. It was contended for the state that these acts were a violation of the provision quoted; but the court held that this provision recognized the banks then in existence, and permitted their continuance; and that they were only mentioned therein, in order to except them out of the limitation imposed upon the power of the legislature in reference to the creation of other banks. The court also say (p. 683) that "the act of 1835 purports to be a continuation of an old charter, and is such in fact. The distinction between a new charter and the renewal of an old one is fully recognized by authority. The continuance of an old charter is not the creation of a new corporation; and it is said that, in pleading, the latter act need not be noticed, the validity and authority of the corporation being derived from the

former one." It is evident that neither of these cases is an authority in support of the validity of such an act as that in question in the case at bar.

It is suggested by the defendant's counsel, as a point to be considered in this case, that upon the faith of the act of 1861 and acts amendatory thereof, several millions have been invested in the securities of the defendant, under circumstances which estop the state from disputing the legal existence of the defendant as a corporation. If the act of 1861 were not clearly unconstitutional, it would be our duty to uphold it ; and any doubt that might exist should be resolved in favor of its validity. And where rights of property have been acquired, under and on the faith of an act of the legislature which is drawn in question, the court, in a doubtful case, may sometimes not improperly allow its judgment to be influenced by a consideration of the disastrous consequences which a decision adverse to the validity of the act would have upon vested rights acquired under it. *People* v. *Marshall*, 1 Gilman, 687–9. If this were a doubtful case, and the effect of our decision would be to invalidate the bonds issued under the act of 1861 and the amendatory acts, it might be urged, on the one hand, that these rights should be regarded and protected, and, on the other hand, it might be said that it was the duty of the bondholders, before purchasing, to enquire into the validity of the legislation under which the bonds were issued, (*The Floyd Acceptances*, 7 Wall. 666 ; *Marsh* v. *Fulton Co.*, 10 Wall. 676,) and that, upon such enquiry, they could not have failed to learn, not only that the act of 1861 was invalid, but also that, prior to the passage of the acts authorizing the issue of bonds by the corporation organized under it, its invalidity had been clearly set forth in an able and lucid opinion of the attorney general of the state, prepared at the request of the senate of the state, furnished to that body on January 31, 1865, and in the same year published pursuant to an act of the legislature. Opinions of Attys. Gen., p. 463.

But in the case before us, we are not necessarily concerned with any controversy between the state and the defendant, or between the defendant and its bondholders, who are not parties to the suit; nor is the case so doubtful that the effect which our judgment may possibly have upon the rights of any third persons should be allowed to influence our decision of the question at issue between the plaintiffs and the defendant. Whether that decision can in any way affect the bondholders, or whether the defendant would or would not be estopped, in proceedings by its bondholders, to question the validity of the legislation under which it has assumed to be a corporation, and, as such *de facto* corporation, has obtained loans of money on its bonds or other securities, are matters we are not called upon to consider or determine. Should a case hereafter arise involving the rights of the bondholders, those rights, whatever their nature or extent, will be fully protected. In the case at bar, we have only to decide whether the defendant can derive from the act of 1861 and the amendatory acts the power to take from the plaintiffs, without their consent and against common right, the lands described in the complaint; and we are clearly of opinion, for the reasons we have stated, that these acts are inoperative to confer upon the defendant any such power. Beyond this it is unnecessary and would be improper for us to go in this case, and we therefore refrain from expressing any opinion as to the effect of the evidence offered by the plaintiffs to show that the defendant is a corporation duly organized under the general railroad law.

In respect of the plaintiffs' right to the injunction prayed in the complaint, this case is clearly within the rule laid down in *Harrington* v. *St. P. & S. C. R. Co.*, 17 Minn. 215; and see *Com.* v. *Pittsburgh & C. R. Co.*, 24 Penn. St. 159.

Order reversed.

---

NOTE.—Having reached the conclusion that the act of 1861 is invalid, after much consideration, and we need not say with much reluctance, and the case being of such importance, and the question and the interests involved being of

such magnitude, and the point which seems to us decisive of the case not having been so fully argued as some other points of the case which we have not deemed it necessary to consider, we may be not unwilling to relax, in this instance, the rule by which the court is usually guided in allowing a re-argument, if, upon examination, the defendant's counsel should be of opinion that, on such re-argument, he will be able to present the claim of the defendant in a different light from that in which it now appears to us; it being understood that in this particular the case will not stand for a precedent in ordinary cases.

Pursuant to the leave granted in the foregoing note, a re-argument was applied for and granted, and the case was re-heard at the April Term, 1875.

*E. C. Palmer* and *John B. & W. H. Sanborn,* for appellants.

If a corporation existed under the act of 1857, the corporators acquired all the rights and franchises conferred by the act, and could not be deprived of them by subsequent legislation, without their consent. *Town* v. *River Basin,* 2 Douglas, 530; *Washington Bridge Co.* v. *State,* 18 Conn. 53; *Young* v. *Harrison,* 6 Ga. 130; *County of Richland* v. *County of Lawrence,* 12 Ill. 1; *Sage* v. *Dillard,* 15 B. Monroe, 340; *Case of St. Mary's Church,* 7 Serg. & Rawle, 517, 562; *McRoberts* v. *Washburne,* 10 Minn. 23. The present company has not succeeded to the rights of the original company. Whatever the corporators took under the original grant, they acquired by virtue of its express terms. No organization was effected, no subscriptions made, no stock taken. But all the franchises granted, and limitations and duties imposed, had reference solely to the building of the railroad described in the act. The right and power to condemn private property were confined to the necessities of that particular enterprise. The corporation, if it was such, became invested with these well defined rights, and with no other or different rights. The corporators named, until organization and subscription of stock, were as much the owners of these rights as the stockholders would have been, had there been any such, and it was impossible for any man or set of men to displace these corporators, or acquire their rights or franchises, without their consent. The charter

being a contract, its obligation could not be impaired by subsequent legislation.

The act of 1861, and all proceedings thereunder, are invalid, and plaintiffs' property cannot be taken by virtue thereof. *Ex parte Pritz*, 9 Iowa, 30 ; *Banet* v. *Sangamon R. Co.*, 13 Ill. 504 ; *Fowle* v. *Common Council*, 3 Pet. 398 ; *Orville & Virginia R. Co.* v. *Plumas Co.*, 37 Cal. 354 ; *State* v. *Dawson*, 16 Ind. 40.

The act is in direct conflict with § 2, art. 10, of the state constitution. It attempts to form or create a corporation. Apt language is used to effect this purpose. If the language of § 1 of the act of 1857, by its own force, created a corporation in which the corporators named were grantees, then the same language in the act of 1861 must create a corporation in which the corporators named therein are grantees, and the date of corporate existence must coincide, in each case, with the date of the approval of the respective acts.

By the act of 1861, a distinct set of corporators is created, a new and different name given, a wholly distinct and different railroad authorized. There are other differences, important and vital. See §§ 2, 4, 6, 10, 18, 19, in comparison with corresponding sections of the act of 1857. Sections 6 and 19 of the act of 1857 are not in the act of 1861. A fair comparison of the two acts shows that the act of 1861, if valid, creates a corporation, as distinct and separate from that created or authorized by the act of 1857 as can well be effected in the enactment of railroad charters.

There are two tests which are decisive in all cases of this kind. 1. Could the two corporations exist at the same time, and exercise all the powers granted, without necessary conflict? 2. Would a subscriber to the stock of the corporation created under the act of 1857, become, by reason of that fact, a stockholder in the corporation created by the act of 1861, or could his obligations to the first corporation be enforced by the second, on the ground that the two were identical?

It needs but a glance at the map of the state to show that

a railroad can be built, as provided by the act of 1857, and operated for all time, without possibility of conflict with any rights, privileges or franchises conferred by the act of 1861. In fact, there are two railroads now constructed and in operation, on the precise routes designated in the two acts, and by two distinct corporations, the Northern Pacific Railroad Co., chartered by congress, and the Lake Superior & Mississippi Railroad Co., chartered by the state of Minnesota, and in no possible sense can they be considered one and the same, or their lines of road identical, or parallel, or intended to subserve the same general purpose. If, under the act of 1857, the road had been built, on or near the line indicated, from Lake Superior to the Nebraska line, it would still have been competent for the legislature, had not the constitution prevented, to create the defendant corporation, as it attempted to do, in 1861. And such corporation could have built the road it has built, without disturbing the rights, franchises and interests of the first company. But the building of the road cannot change the construction to be given to the act. That would depend on the language used.

The fact that the act of 1861 is called an amendment does not change its scope and character. The legal effect of the act is not determined by its title. There was no necessity that the legislature should resort to the act of 1857 ; for there was another territorial act in full force, if defendant's theory is correct, providing for a railroad over the very route now occupied by defendant's road. Laws 1853, ch. 15.

As to the second test: Neither corporators nor stockholders in the corporation under the act of 1857 could be brought into legal or contract relations with the new enterprise, without their consent. In fact, the act of 1861 does not attempt to compel, or even recognize, such relation. The existence of a corporation, or any person, having rights under the act of 1857, is expressly ignored and repudiated in the act of 1861. There is no ground for claiming that the legislature intended to do more than to make a new

grant, to new grantees, of distinct and specific rights and franchises, under the mistaken idea that the power to do so had not been prohibited by the constitution.

We do not ignore the distinction between a corporation and its property, where such distinction exists; but a railroad charter must define, with reasonable certainty, the line of road to be built, and limit the power of the company to condemn private property to the convenience and necessities of that particular route. All charters are alike in this respect, and each is confined to its own road. The franchise of condemnation cannot exist apart from the strip of land designated for the road. It is not a floating right or franchise, to be exercised anywhere and everywhere, but is tied to the granted line, and the two unite to form the franchise. They cannot be divorced. So the franchise to be a corporation cannot exist, in a case like this, without some person or collection of persons to receive, hold and exercise it. Nor can it be considered, in a case like this, as existing independent of the franchise of toll, or of eminent domain. No railroad could be built, without the power to condemn the necessary land for right of way, etc., nor could a railroad be operated, without the right to reasonable tolls. Hence, the distinction attempted to be drawn between these franchises is of no practical or legal importance. Such franchises all go together, and constitute the essential life of the corporation. Hence, we insist that when the act of 1861 was passed, it was not intended to, and did not, operate upon an existing corporation, but was designed to bring into being a new corporation. The incorporators, the name, the line of road, the terms and conditions—all are new. There is no identity whatever between the two acts, except that both relate to railroads.

The present corporation must find its life, if it has life, in the act of 1861, and the proceedings taken thereunder. Had that act never been passed, or had there been no organization thereunder, there would not now be any corporation seeking to condemn plaintiffs' property, and this action

would not have been commenced. It is this legislation, and these proceedings, and these only, which are alleged and relied on as conferring a right to take plaintiffs' property, against their will. The Nebraska & Lake Superior R. Co. is not seeking to condemn plaintiffs' property. The persons named in the act of 1857 have not located a railroad over plaintiffs' land, and they are not claiming to exercise the right of eminent domain. Were such the case, their right and authority would be found, if anywhere, in the act of 1857, and their subsequent proceedings thereunder. But the act of 1857 is not referred to in the answer, nor is any right claimed under it. The answer attempts to justify solely under the act of 1861, and the amendatory acts, and the proceedings under those acts.

*James Smith, Jr., John M. Gilman,* and *Lorenzo Allis,* for respondent.

The corporators named in the act of 1861 were merely trustees or commissioners appointed to hold the grant till the company was organized, and no longer, and charged with the duty of organizing the company. The contract made by the act and the acceptance of the corporators was a grant of the franchise of corporate existence, and of certain other franchises to be used by the corporation. The persons named as corporators had no personal interest in these franchises. They were merely the channel through which the grant passed to the real grantee, the Nebraska & Lake Superior R. Co. Until the organization of that company, none of the franchises granted could be exercised, except the mere franchise of organizing; and upon such organization, the franchise to be a corporation, held by the persons named in the act as mere naked trustees, passed instantly, and by force of the statute, to the company, and these incorporators became *functi officio.*

The grant contained in the act would not, prior to any subscription to the capital stock, be impaired by a change of the persons appointed by the act to organize the company. Until subscriptions had been made, there would be no one

to complain of such a change but the designated persons themselves, and they would have no other interest in the matter than in their capacity of commissioners, appointed by the sovereign power, to organize the corporation created by that power. Their function is public and official, and not private or personal. They are persons designated by the sovereign to complete the grant made by the sovereign, and it would be strange if the sovereign could not change these functionaries at its own pleasure at any time before others had acquired, by subscription to the capital stock, a valuable and vested interest in their appointment. Possibly, after subscriptions made, the subscribers might rightfully object to a change in the commissioners of organization, without such subscribers' assent; but till such subscriptions, we can see no limit to the power which the legislature might rightfully exercise over the appointment of the commissioners. The legislature, therefore, in substituting other commissioners of organization, in place of the former ones, as it assumed to do by the first section of the act of 1861, violated no vested right, and impaired no contract.

Clearly the legislature had the right to substitute the new for the old commissioners, with the consent of the latter; and as the substitution was made, and has continued to be acted upon for many years, without objection from the old commissioners, their consent should be presumed. If the new commissioners were usurping the functions of the old, the latter could have obtained redress by appealing to the courts. But they stood by, and saw the new commissioners assume and discharge all the functions bestowed by the act, and made no objection. It is too late for them to complain now, when the trust has been executed, and the commissioners have become *functi officio;* and if *they* could not now complain of the assumption and execution of the trust by the new commissioners, third parties, who can have no interest in the *personnel* of the commissioners who organized the company, cannot be heard to complain, if the organization was made pursuant to the statute.

The act of March 8, 1861, *purports* to be an amendment of the act of May 22, 1857. It is manifest that it was intended as such amendment by the legislature, and received and treated and acted upon as such by those interested in it. This being clear, the court should not give the act a different effect, and construe it as an original act, creating a new corporation, unless compelled to do so by some imperative rule of interpretation. In *Bellows* v. *Hallowell Bank*, 2 Mason, 31, Story, J., says, (p. 43,) " To ascertain whether a charter creates a new corporation, or merely continues the existence of an old one, we must look to its terms, and give them a construction consistent with the legislative intent, and the intent of the corporators."

The real test of the validity of the act of 1861, as an act merely amendatory of the act of 1857, is this : Section 18 of the act of 1857 expressly authorizes amendments not impairing vested rights of the corporation, and up to the passage of the act of 1861, this corporation had acquired no vested rights. This phrase " vested rights " means the valuable rights which the corporation might acquire, under the charter, by other action and proceedings thereunder than the mere acceptance of the charter. The rights meant to be protected, must necessarily have been rights acquired after the acceptance of the charter, and in the course of the business of the company ; otherwise § 18 is absolutely without effect.

The act of 1861 makes no such radical change in the *enterprise* authorized by the act of 1857 as to amount to a substitution of a new and different enterprise for the one originally contemplated and authorized. The object of the original act was the construction of a railroad from the west end of Lake Superior westwardly to the Nebraska line,— that is, to the westerly line of the territory. The only point on the road definitely fixed is the eastern terminus. The western terminus was at any point on the Nebraska line within the territory, and the line of the road between these termini was left wholly to the discretion of the company.

18

Indeed it is not quite clear that the company was required to go to the Nebraska line. The meaning may be that the company was simply required to construct the road, from the eastern terminus, westerly, within the territory of Minnesota, "by such route as the corporators may deem most expedient." If the company had organized, and proceeded to construct its road, under the original charter, and in doing so, had run its road through St. Paul, this would not have been a violation of its charter. A deflection of 150 miles from a due west line, in a route so long, and where so much has been left to the discretion of the company, can hardly be regarded as a palpable violation of its charter. It would certainly be a very narrow construction of the language, and the obvious spirit and purpose of this act, to deny to the company the right to run its road through St. Paul. The cardinal object of this act was to give the vast territory, then known as the Territory of Minnesota, a railroad connection with the Great Lakes. But, when, in 1861, further legislation upon this charter was had, a considerable portion of the original territory of Minnesota formed no part of the state. It was also apparent that the St. Paul & Pacific Railroad would open up the western portion of the state, and give it a railroad connection with St. Paul, and that St. Paul and Minneapolis would become the great railroad centre of the state; and hence, that if a railroad could be built from the head of Lake Superior to St. Paul or Minneapolis, the whole purpose and object of the act of 1857 would be accomplished, and all the benefits intended and contemplated by that act would be secured. The act of 1861 is, therefore, wholly in accord with the spirit, purpose and objects of the act of 1857, and involves no violation of even the letter of the former act, and such was the opinion of Mr. Reverdy Johnson, speaking in the Senate of the United States, under the sanction of his official oath. Congress. Globe, 1863–4, pp. 962–3.

If under the act of March, 8, 1861, the corporators therein named organized as such, and have in fact so acted, claim-

ing corporate rights and privileges, and such organization and claim have been recognized by legislative acts, such acts and recognition constitute the association so acting a corporation *de facto*, and its legal existence can be questioned by the state alone, as provided in ch. 79, Gen. Stat., and cannot be questioned in this, or any other collateral proceeding. *Robinson* v. *London Hospital*, 21 Eng. Law & Eq. 371; *Lehigh Coal Co.* v. *Bridge Co.*, 4 Rawle, 94; *Bank of Niagara* v. *Johnson*, 8 Wend. 645; *People* v. *Manhattan Co.*, 9 Wend. 351, 382; *Cochran* v. *Arnold*, 58 Penn. St. 399; *Goddard* v. *Smithett*, 3 Gray, 116.

*R. L. Ashhurst* and *J. C. Bullitt*, also for respondent.

Every presumption is to be made in favor of the validity of acts of the legislature. No such act can ever be declared void, unless clearly prohibited by the constitution of the state, or of the United States, and the prohibition must be affirmatively established, beyond all question, and all doubt. Cooley, Const. Lims. 159-187; *Com.* v. *Smith*, 4 Binn. 123; *Fletcher* v. *Peck*, 6 Cranch, 87; *Sharpless* v. *Mayor of Phila.*, 21 Penn. St. 147, and cases cited.

The franchise of being a corporation is something different and distinct from the ordinary franchises. It is the birth of a new being in the state, created by law, and clothed with certain powers necessary to its existence. It may or may not be invested by the state with other franchises and rights of property. But even if the corporation should mortgage its franchises, and, by a sale duly made, become devested of them entirely, it does not lose its being. The right to be a corporation still remains. It can proceed to collect debts, to dispose of its property, real or personal, not sold, and do any other acts not connected with the franchises of which it has been dispossessed.

Angell & Ames, §§ 4, 5, 6; 2 Bl. Com. 37; 1 Kyd on Corp. 15.

It is the *formation*, only, of corporations, by special law, which is prohibited by § 2, art. 10, of the constitution of Minnesota,—in other words, the *creation* of new corporations by special law. As long as a new corporation is not

created, therefore, any acts of the legislature of Minnesota, conferring either franchises, privileges, or rights of property, so long as they are not the *creation* or *formation* of a new corporation, are entirely constitutional, whether they are special laws or not. *Moers* v. *City of Reading*, 21 Penn. St. 188 ; *Cleveland etc. R. Co.* v. *City of Erie*, 27 Penn. St. 380 ; *Fitz* v. *Minn. Cent. R. Co.*, 11 Minn. 414, 422 ; *First Div. St. Paul & P. R. Co.* v. *Parcher*, 14 Minn. 297 ; *McRoberts* v. *Washburne*, 10 Minn. 23 ; *People* v. *Marshall*, 1 Gilm. 317 ; *Wellsboro' & Tioga Plankroad Co.* v. *Griffin*, 57 Penn. St. 417 ; Cooley, Const. Lims. 129 ; 1 Redfield on Railways, 53 ; Angell & Ames, § 774.

The act of 1861, changing the name, the route, the capital, and some of the corporators of the Nebraska & Lake Superior R. Co., *created* or *formed* by the territorial legislature of Minnesota, in 1857, was, in terms, an amendment to the act of 1857, and the intention of the legislature being clear, it must be so regarded by the courts. But even if this were otherwise, it is, in point of fact, only an amendment. By itself, it could not stand. It simply confers powers, and makes changes in the original act, in the exercise of powers which are not prohibited by the constitution to the legislature of Minnesota, and must therefore be recognized as proper and lawful by the courts. *Huff* v. *Winona & St. Peter R. Co.*, 11 Minn. 180 ; *First Div. St. P. & P. R. Co.* v. *Parcher*, 14 Minn. 297 ; *Bellows* v. *Hallowell Bank*, 2 Mason, 44 ; *Norris* v. *Mayor etc.*, 1 Swan, 164 ; *Johnson* v. *Crawley*, 21 Ga. 316 ; *Lea* v. *Am. Coal Co.*, 3 Abb. Pr. (N. s.) 1 ; *Bennington Iron Co.* v. *Campbell*, 2 Paige, 159 ; *Luce* v. *Graham*, 4 John. Ch. 170 ; *Langdon* v. *Applegate*, 5 Ind. 327 ; *Littler* v. *Smiley*, 9 Ind. 116 ; *Girard* v. *Philadelphia*, 7 Wall. 1 ; *Taylor* v. *Newberne*, 2 Jones Eq. 141 ; Angell & Ames, §§ 83, 780.

*Plaintiffs' Counsel, in reply:* The defendants contend that the real and ultimate grantee of the franchises granted in the act of 1857 was the Nebraska & Lake Superior R. Co., as the same should be organized under the provisions of that act ; that the persons named in the act became invested

with the franchise to be a corporation, and held the same as a mere naked trust, which would pass to the company the moment an organization was effected; and that, before organization, it was competent for the legislature to change the persons named, and substitute others.

But by the express terms of the act of 1857, the persons therein designated, "and their associates, successors and assigns, be, and *they* hereby are constituted a body corporate and politic by the name and style of The Nebraska & Lake Superior Railroad Company," etc. Section 19 requires notice of intention to proceed under the provisions of the act to be given by "the *said company*." The court has already held, as claimed by defendant, and found by the court below, that this notice was duly given, and that the act of 1857 became operative, and has never been repealed or changed, in any manner affecting the rights of the original corporators, or the existence, under the act, of the Nebraska & Lake Superior R. Co. The question, therefore, attempted to be raised, respecting the powers of the legislature to change the "commissioners," as defendant's counsel styles them, cannot be made here.

The language of the act, and the facts found, show that the incorporators named became invested with all the powers, privileges, franchises and immunities granted, and so far acted under the powers conferred as to acquire a vested interest and right therein. There is no such franchise as "the franchise of organizing," considered as an independent power or privilege, conferred in the act. The substantive grant is found in sections one and two, and the machinery of organization is merely ancillary to that, and dependent upon it. The franchise of corporate existence, of continuous identity, of separate designation; the right of using a common seal, and to survey, locate, build, operate, and perpetually maintain a particular line of road, all passed from the sovereign, and became vested in the persons designated in the act, before the right of organization could be exercised, and as conditions precedent to organization. The incorporators could no more be changed, without their con-

sent, prior to making subscriptions for stock, than they could subsequently thereto. They represented the corporation as completely, in a legal sense, as if they were sole stockholders. The change effected by the act of 1861 could not have been greater, had stock been taken, an organization on a working basis perfected and the construction of the road commenced. There might have seemed, in such case, a greater interference with vested rights ; but the corporate change,—the destruction of corporate identity,—could not have been more complete in that case than it is now.

The case shows clearly that the respondent succeeded, if at all, to the corporate powers and franchises of the Nebraska & Lake Superior R. Co., by the intervention and action of the legislature alone. Neither the defendant corporation, nor any of its members, bought any stock, or took any assignment of any corporate rights, or rights of individual corporators. The legislature, by the act of 1861, clothed the defendant corporation with all the powers it claims to possess. If the defendant desires to succeed to the rights and franchises of the Nebraska & Lake Superior R. Co., it has only to purchase them, and then enjoy. They cannot be conferred by the legislature, for they do not belong to the state to give.

Another point much dwelt on is this : that the act of 1861 was the continuation or *reiteration* of an existing franchise, to wit, the franchise to be a corporation, and cannot, therefore, be held to be the *creation* of a corporation. This argument assumes that the franchise of corporate existence can be created, and continue as a legal entity, an abstraction, independent of locality, corporators, or special designation ; and it further assumes that the corporation existing under the act of 1857, was not, in any substantial respect, anything but a mere franchise or right to be, to exist, and hence that this franchise or right of existence could be designated by a new name, located in a new and distant place, and bestowed upon new grantees, without violation of any constitutional provision. None of these assumptions can stand.

The franchise or right to be a corporation cannot be created as an independent thing, disconnected from name, place, and persons to exercise the right. The franchise of corporate existence includes everything essential to corporate life, everything necessary to constitute a complete and perfect artificial being.

The corporation created by and under the act of 1857 possessed every attribute of a complete and perfect artificial being. The legislative grant was not of the mere right to exist, if such a grant was possible, but it was of certain designated rights and privileges, to certain persons named, under a distinct and special designation, to be exercised within certain defined territorial limits. Other railroad corporations had been, in like manner, created and located, so that the full benefit of the grant, in each case, could be enjoyed without conflict. Each had its appropriate field, or line of operations. Each had corporate existence to the same extent and completeness, and no right had been lost or abridged, in consequence of nonuser or misuser, or other cause, save in cases where foreclosure and sale had occurred under constitutional sanction. The Nebraska & Lake Superior R. Co. was as fully a corporation as the Southern Minnesota R. Co., or any other railroad company which had located and commenced to build its line of road; as fully as if stock had been taken, a board of directors chosen and the construction of its road begun or completed.

The act of 1861 does not *purport* to renew or *reiterate* anything. In express terms, it creates new franchises, privileges and immunities, provides for their exercise in a new and different locality, and invests new persons with an exclusive right to and interest in all this, as property. It differs in no essential respect from an act making a like grant, but without reference to the act of 1857. No franchise created by the act of 1857 is *transferred* or attempted to be transferred to the new grantees. The new parties are *constituted* a body corporate: they become such, not by association, succession, purchase or grant, but by mere force

of the language of the new act. They are constituted legislative grantees at once, and then made, for the first time, the recipients of well defined, valuable rights and property, separate and distinct from other corporate rights and property possessed by other railroad companies. The persons named were clothed, for the first time, and solely by force of legislative will, with powers not before possessed, and in which the general public did not share. The state, in its sovereign capacity, conferred upon these new parties certain franchises not before granted, and brought them together in a corporate relation not theretofore existent. The powers thus granted were corporate powers, and could only be exercised by the persons, in the manner, at the times and places and to secure the objects designated in the act itself.

The legislature could not rightfully, in 1861, have conferred, even upon the old corporation, the power or franchise to obtain compulsorily the right of way for a railroad, over the present line of defendant's road. A corporation had been created, and was in existence at that time, for the express purpose of building a railroad over that very route. Laws 1853, ch. 15. The fact that a designated strip of country had been appropriated for the road of that corporation very clearly indicates that the original purpose of the act of 1857 was not to furnish a railroad to the region south of Lake Superior, but to afford railroad facilities to that larger unsupplied territory lying westwardly. It is not at all likely that only three or four years after the passage of the act of 1853, another charter could have been granted for a road which would or might conflict with, or supplant, the charter first granted. Such charters were then considered valuable, were eagerly sought after, and care was taken to prevent conflicting grants.

According to defendant's theory, these two corporations, one created in 1853, and the other in 1857, one to build a road westerly from Lake Superior to the Nebraska line, and the other south to St. Paul, could interchange routes; for if the Nebraska & Lake Superior R. Co. could so far vary its line

as to run south to St. Paul, the Mississippi & Lake Superior Co. could, in turn, run westerly, *via* Cheyenne, to Nebraska, and thus effect a complete transposition of the two corporations. This shows the absurdity of the claim that locality is not a substantial determining element in a railway corporation.

Again, these two lines of road could be built, operated and maintained by two separate, distinct, and wholly independent corporations, without possibility of conflict. Each might have had a land grant, and no collision of interests would have occurred, except, perhaps, within the first few miles of the common terminus. If the corporation created under the act of 1857, on the route therein provided for, had been granted lands in the usual way,—in that case, upon definite location of the line, the grant would have become fixed, and so remained. Of course, it could not be pretended that, in such case, the enterprise could be so far varied as to become identical with a route at right angles with the first line ; for only slight deviations, for engineering purposes, are permissible. But even if the line had not been definitely located, the corporation could not, by locating a line south, to St. Paul, under the act of 1861, be able to secure the lands appropriated to the route designated in the act of 1857, and this for the reason that the one line is such a different line from the other, so essentially diverse and foreign, as to destroy the identity of the original enterprise. It is another and different road, accommodating another and different section of country, and requiring separate and distinct corporate management. There is no identity of enterprise, or of corporation. They have nothing in common, save that both are railroad corporations, and thus belong to the same class.

GILFILLAN, C. J. Upon the first argument of this case, the point which, as then presented, seemed to the court to be decisive, was not argued by counsel as fully as its importance would justify ; and for that reason, and because of the magnitude of the interests, both public and private, in-

volved in the decision of the point, the court, although it arrived at an opinion upon that argument, felt disposed to re-open the case for re-argument and reconsideration, if the parties so desired, and therefore, in a note appended to the opinion then prepared, it expressed its willingness to hear a re-argument, without requiring defendant to bring the case within the general rule governing applications for re-hearing after a decision.

Having heard the re-argument, which was conducted on behalf of each party with an ability and thoroughness of research seldom equalled, we are satisfied that there are some considerations bearing on the point in issue, to which the court, in its first examination of the case, did not attribute sufficient importance; and we have arrived at a conclusion the reverse of that entertained on such first examination.

The main question is, Was the act of 1861 unconstitutional?

It is claimed that it was, because : *First.* If operative, it created a new corporation, and was therefore repugnant to § 2, Art. 10 of the constitution. *Second.* That if it assumed merely to transfer the ownership of an existing corporation from those in whom such ownership was then vested, without their consent, to the persons named in the act, it was in violation of the provision, in both the federal and state constitutions, which prohibits the passing of any law impairing the obligation of contracts.

When the legislature enacts any law, we must presume that it has considered and become satisfied of its constitutional power to pass the act; and although there is no longer any doubt of the authority and duty of the court, when the question is properly presented, to declare such acts invalid, if repugnant to the constitution, yet it is due to the legislature, a co-ordinate branch of the government, that such authority should be exercised only when absolutely necessary, and with extreme caution. Chief Justice Marshall, in *Fletcher* v. *Peck*, 6 Cranch, 87, states (p. 128) that "the

question whether a law be void for its repugnancy to the constitution is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. * * * It is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

The law before us is not altogether free from difficulty; but after a careful consideration of its provisions, we do not feel that certain conviction of its incompatibility with the constitution which would justify us in setting it aside.

That the state legislature may, within a certain limit, pass laws to amend acts of the territorial legislature creating corporations, is clear. Were § 2, Art. 10, not in the constitution, the power of the state legislature to pass amendments to such laws, so long as the amendments should not impair the obligation of any contract, would be unquestionable and unlimited. Such amendments, only, are within the prohibition of that section as attempt to do, or as would have the effect to do, what that section prohibits. Any amendment which, if operative, would in effect form a corporation, (except for municipal purposes,) would clearly be repugnant to the section, because it would attempt to do what that section forbids; but the power of the legislature, in respect to such territorial laws, so long as it does not attempt to form a corporation, is not affected by the prohibition.

The act of 1861 is entitled "An act to amend an act entitled 'An act to incorporate the Nebraska and Lake Superior Railroad Company.'" The first clause of section 1 reads: "That the act of the territorial legislature of Minnesota, entitled an act to incorporate the Nebraska and Lake Superior Railroad Company, approved May 23, 1857, be and the same is hereby amended and continued so that it shall read as follows." It purports to be, is expressly

declared to be, an amendment of a former law, and not an original act. This is significant of the actual intention of the legislature—of what was in its mind in passing the act. It shows that the legislature actually intended—it is a declaration of such intention—that the provisions of the act should apply and relate to the corporation and franchises created and granted by the act of 1857, and not to any other.

It is possible for the legislature, in such case, to act dishonestly; to intend the creation, by such means, of a new corporation; to attempt to do what the constitution forbids, under the pretence and color of doing what it permits. We have no right, however, to assume that it had any such motive. When it in substance declared that the provisions of the act of 1861 were intended to apply only to the corporation created, provided for, and regulated, by the act of 1857, we are bound to presume that such was its honest intention.

And if there was no actual intention on the part of the legislature to create a new corporation, instead of providing for and regulating one already existing, then no such corporation was created by the act, unless the character of its provisions is such that, if permitted to be operative, the act did necessarily, in legal effect, create a new corporation, although such effect was not in the mind of the legislature.

That a legislature might, in such a case, misapprehend the legal effect of the act passed by it, just as it might mistake as to the limits of its constitutional power, is possible. It might, without intending to create a new corporation, attempt such radical and essential changes in the constitution of an old one as to amount to the creation of a new one; and if such must be the necessary result of such changes, the act must be just as clearly within the constitutional prohibition as though the legislature actually intended the result, and fully understood that such would be the effect of its act.

There being no actual intention by the legislature to cre-

ate a new corporation by the act of 1861, the inquiry is brought down to this : Did the provisions of the act so radically and essentially change the original act that, if operative, the amending act must necessarily have the legal effect to bring into existence a new corporate body, notwithstanding the legislature did not intend such result? that is, was the corporation, as defined by the act of 1861, necessarily and inevitably another and different legal entity from that created by the act of 1857?

The changes made by the act of 1861, which are claimed to have brought about that result, are in the names of the corporators, and in the route or line of railroad, that is, in the enterprise or business, which the corporation was created and authorized to prosecute.

It is not urged that a change of name alone would affect the identity, nor can it be seriously insisted that a change in the corporators has that effect. When a corporation is created, it remains the same, whatever changes in its ownership may take place, whether it is held and owned by the original corporators, or by stockholders—by one set of stockholders, or by another.

If an act of the legislature should provide for a corporation to be known by a name not held by any previously existing corporation, and should name, to organize and set it in operation, corporators not named in any other act of incorporation, it would be evident that the corporation so provided for was a new one. But if the act itself showed that the name was intended to be given to a corporation previously existing, in place of one formerly held by it, and the corporators named in the act were intended merely to be substituted in the stead of former corporators of an existing corporation, the change would certainly be of very little, if any, importance in determining whether a new corporation was necessarily created by such an act. An essential change in the enterprise or business of the corporation would be of much more importance,—indeed, might be decisive.

Thus, if the business of a corporation created for the purpose of constructing and operating a railroad should be changed by law to the business of banking, or mining, or manufacturing, it would be, after the change, a different corporation, although it might retain the same name, and be owned by the same corporators or stockholders. We do not mean to intimate that a law which should authorize a corporation to add to the business which it was created to transact other business, even of a different character, which might be necessary or convenient to the advantageous performance of its original business, would necessarily change the identity of the corporation. That might depend upon whether the new business was its principal, or only incidental to its principal, business. And we do not doubt that a corporation may be authorized to extend or restrict, to some extent at least, the business or enterprise which it was created to prosecute, without affecting its identity. Thus if a corporation should, by the act creating it, be authorized to conduct the business of a bank of issue, with authority to issue notes to the amount of two hundred thousand dollars, a law restricting the issue to one hundred thousand, or authorizing it to increase the issue to four hundred thousand, would still leave it the same corporation. And we see no reason why, when the corporation is organized for the purpose of prosecuting a particular enterprise, a law may not pass relieving it from a part of the enterprise, without making a new corporation. It is impracticable to lay down a rule defining the limits within which such legislation may be had, without affecting the question of identity, and we do not find it necessary to attempt it in this case.

The enterprise described in the act of 1861 is substantially included in that described in the act of 1857. The general business, that of constructing and operating a railroad, is the same in both. The difference claimed is that, in the act of 1857, the company was authorized to construct and "to alter the line thereof, without changing the eastern terminus, a railroad with one or more tracks or lines of rails, to com-

mence at some convenient point or place, (within the terri- tory of Minnesota,) at the west end of Lake Superior, or on Superior Bay, or on the Bay of Saint Louis, in the ter- ritory of Minnesota, and running thence westerly, within said territory, *via* Cheyenne City, to the Nebraska line, *or such other route as the corporators may deem most expedient;"* and by the act of 1861, it was authorized to construct, and " at pleasure to alter the line thereof, a railroad with one or more tracks or lines of rails, to commence at some conve- nient point or place, within the State of Minnesota, at the west end of Lake Superior, and running thence, by the most feasible route within this state, to some point on the Mississippi, with the right to extend the same to the Min- nesota river."

To locate the eastern terminus at the point indicated in the act of 1861 was certainly within the authority contained in the act of 1857. Had the act of 1857 confined the com- pany to the line *via* Cheyenne City, the act of 1861 would have authorized, and the line as actually constructed would be, a very great departure, whether sufficient to render the latter act obnoxious to the constitutional objection is un- necessary to determine; for that line was not imperative, but the company was given, by the act of 1857, its choice of that line, " *or such route as the corporators may deem most expedient,*" and this authorized the company to cross with its line any part of the territory between the termini men- tioned in the act, the eastern of which was Lake Superior, or the Bay of Superior, or the Bay of St. Louis, and the western, the Nebraska line, no point on that line being indicated in the act. Under this large discretion in the selection of its line, we do not think the company was bound to select a perfectly straight line, or, the general direction being west- erly, to follow, at all points on the line, a westerly direction between the two termini.

The line as actually constructed is, we are satisfied, part of the route which the company might have selected for its road, had the act of 1861 not been passed. It is not in a

straight line between the eastern and western termini mentioned in the act of 1857; but the departure is not such as, if the line had been selected under that act, with the acquiescence of the state, would have radically changed the character of the enterprise.

That, by the act of 1861, the company might terminate its line at the Mississippi river, and was authorized only to construct it to the Minnesota river, instead of to the Nebraska line, is, I think, (though the majority of the court do not attach the same degree of importance to it,) the most serious objection to the act. We have already expressed our opinion that, when a corporation is created for the purpose of prosecuting an enterprise the extent of which is defined by the act of incorporation, the legislature may relieve the corporation from the prosecution of a part of the enterprise as originally defined, without changing the character of the corporation; so, also, the legislature, with the consent of the corporation, may limit the exercise of the corporate franchise to only a part of the original enterprise, without any such effect. The difficulty consists in determining how far the legislature may go in that direction, without creating what is substantially a new corporation. We entertain some doubt whether, in this case, the legislature has not gone quite as far as a strict construction would permit; but we do not feel that certainty of conviction upon it, which, under the rules of interpretation by which courts must be governed in interpreting statutes in respect to their constitutionality, would authorize us to declare this act void.

The legislature, at an early day in the history of the constitution, adopted, and has since acted on, a construction of it which would support the act in question. It has repeatedly, and in the most solemn manner, recognized the validity of that act; and such recognition appears to have been, until this case arose, acquiesced in by the people. Many acts relating to other corporations, and having some, at least, of the objectionable features contained in the act before us, were passed at an early day, and have been repeatedly recog-

nized by the legislature, and seem to have been acquiesced in by the people. "A practical construction of the constitution, which has been adopted and followed in good faith by the legislature and people, for many years, is always entitled to receive great consideration from the courts." *City of Faribault* v. *Misener*, 20 Minn. 396, and cases cited.

It is not meant by this that a clearly and obviously erroneous construction of the constitution may become controlling by legislative adoption, but that, in a case of doubt, the court may and ought to resort for aid to the acts of the legislature and the people, in construing the provision of the constitution alleged to have been violated. And we think such practical construction is entitled to greater weight, when, in reliance upon it, great enterprises, in which the state as well as individuals are interested, have been undertaken and carried out, and vast sums of money expended or invested in such enterprises.

Some confusion of ideas has arisen in the argument from presenting the spectacle of two distinct railroad corporations, (assuming that this defendant is one,) with different names, different corporators and different lines of road. This confusion arises from assuming, or taking it for granted, that the act of 1857, as originally passed, still continues in force. But that act was, by the act of 1861, in effect repealed so far as related to the name of the corporation and the names of some of the corporators, and modified so far as related to the route or line of road, and continued only so far as not repealed or modified. After the act of 1861, (assuming the assent of the original corporators,) there was no corporation known as the "Nebraska and Lake Superior Railroad Company," no corporation having the same body of corporators, and none with precisely the same route. This defendant must, of course, derive its existence from the act of 1857, but not from those parts of that act which were repealed, only from so much of it as was continued in force. The legislature found in force an act under which there was an existing, unorganized corpora-

19

tion, and by the act of 1861, it undertook, not to leave it in force precisely in its then form, nor entirely to repeal it, but to give to the existing corporation a new name, to provide, for the purpose of organizing and setting it in operation, a new set of corporators in the place of those who had neglected that duty, and to make such modification of the enterprise of the corporation as, in its opinion, the public interests justified.

If a new name and a new set of corporators could be given to the corporation, and its line of road modified to the extent provided in the act of 1861, without making it a new corporation, (and, as we have already shown, we cannot hold that it might not be done,) then the only remaining objection to the constitutionality of the act is that it impaired the obligation of a contract. On this objection, we understand the argument, stating it briefly, to be, that as the substituted corporators acquired no rights in the existing corporation by the act of 1861; as the ownership and right to organize the corporation created by the act of 1857 could not be thus vested in them, because the act of 1861 impaired the obligation of the contract between the territory and the original corporators, the new corporators could not, and therefore did not, organize that corporation, and the body then organized is not that corporation, and if a corporation at all, must be so by virtue of an act passed since the adoption of the constitution.

The act of 1861 assumed to authorize the new corporators to organize and put in operating condition the then existing corporation. They have, assuming to act by that authority, and no other, perfected the organization. That the legislature might, with the consent of the old corporators, confer this authority upon the new, cannot be questioned. The presumption is that an act of the legislature is valid, until the contrary appears; and when the consent of certain persons is necessary to the validity of such act, the presumption of validity includes the presumption of such consent, unless, perhaps, in a proceeding to which such persons are

parties, and in which they object that the act is invalid, because it invades their rights. If they are content to acquiesce in the action of the legislature, its act is valid and cannot be questioned by strangers. Cooley's Const. Lims. 163. As it does not appear that the original corporators ever made any objection to the act in question, the plaintiffs are not in a position to raise it.

The further point is made, in support of plaintiffs' claim for an injunction, that the proceedings under which the company attempted to take plaintiffs' property are without force, for the reason that, in the act under which the proceedings were taken, no provision is made for appeal and trial by jury.

That act is the act of March 6, 1868, amending § 8 of the act of 1861. The section as thus amended provides, in substance, that in order to have the damages ascertained, so that the company may take lands for its road, the company shall file a petition in the court, praying for the appointment of commissioners to assess the damages, give notice of the time and place of hearing; that upon proof of service of the notice being filed, the parties shall be deemed in court, and the court to have jurisdiction of the property and parties, and shall appoint three competent, disinterested persons as commissioners, and fix a time and appoint a place at which they shall meet and organize and hold their first meeting; and that notice of such meeting shall be entered in the minutes of the court; that the commissioners shall be sworn, and shall meet at the time and place specified in the order, and when met, and all present, may proceed to hear the proofs and allegations of the parties, and are authorized to administer oaths to witnesses before them, and shall keep minutes in writing of all their proceedings, in which they shall enter the time and place of their meetings and adjournments, the names of parties appearing before them, and whether in person or by attorney, the substance of the testimony of witnesses examined before them, and all disputed questions which shall be submitted to them, and their

decision thereon; shall make and file with their minutes a report which report shall have the force and effect of the verdict of a jury; and upon filing thereof in court, judgment shall be entered therein as in cases of verdicts in civil actions, and with like force and effect, and subject to like proceedings on appeal, as are now provided for in civil actions in such court.

The proceeding is, from the time of the notice served, a judicial proceeding, subject at all times to the control of the court; and it is, therefore, not liable to the objection which the court held to be fatal in *Langford* v. *Commissioners of Ramsey Co.*, 16 Minn. 375.

In those cases where the constitution does not give an absolute right to a trial by jury, it is held to have been the intention of the people, in adopting the constitution, to leave the mode of trial to the discretion of the legislature. The constitution of the state, when it was adopted, found the right existing in a certain class of cases, and provided that it should remain inviolate. The only change it made in the right previously existing, consisted in extending it to all of that class, without regard to the amount involved. Before that time, the guarantied right existed only under the federal constitution, and extended only to cases of that class where the value in controversy should exceed twenty dollars. In the federal constitution, the class of cases in which the right is preserved, is defined as "suits at common law;" in the state constitution, as "cases at law." Prior to the adoption of the latter constitution, the statute gave the right of trial by jury in all cases at law, whatever amount might be involved.

In *Whallon* v. *Bancroft*, 4 Minn. 109, the court called this statutory right "a qualified right, and not an absolute and indefeasible right;" and said that had the state constitution provided only that the right of trial by jury should remain inviolate, the legislature might have restricted it to cases where the amount exceeded twenty dollars, that is, to cases where, prior to that time, the right was absolute; and that

"it was to avoid this difficulty, and nothing more, that the clause extending the right of jury trial to all cases at law was inserted in the constitution." The court therefore held, in that case, that it was not the intention of the constitution to extend the right to any class of cases where it did not previously exist; and it existed previously, as an absolute right, only in actions at law.

Proceedings under the right of eminent domain, to ascertain the compensation to be paid in taking private property for public use, have never been considered as actions or cases at law, within the meaning of constitutional provisions preserving the right of trial by jury; and except where such proceedings are expressly mentioned in state constitutions, the decisions are uniform that they do not come within the constitution. *Dronberger* v. *Reed*, 11 Ind. 420; *Haverhill Bridge* v. *County Com'rs.*, 103 Mass. 120; *Livingston* v. *The Mayor* etc., 8 Wend. 85; *Penn. R. Co.* v. *Lutheran Congregation*, 53 Penn. St. 445; *Petition of Washington Road Co.*, 35 N. H. 134; *Buffalo Bayou* etc. *R. Co.* v. *Ferris*, 26 Tex. 588.

We conclude, therefore, that while the legislature must provide an impartial tribunal to ascertain the amount of compensation, and give the parties interested an opportunity to be heard before such tribunal, it may determine what the tribunal shall be, whether a jury, a court without a jury, or commissioners selected by a court.

The order appealed from is affirmed.