TRUSTEES OF PILLSBURY ACADEMY v. STATE.
STATE v. TRUSTEES OF PILLSBURY ACADEMY.[1]

February 3, 1939.

Nos. 31,609, 31,789.

[1]Reported in 283 N. W. 727.

366

*William S. Ervin,* Attorney General, *John A. Pearson,* Assistant Attorney General, and *Frank J. Williams,* Assistant County Attorney of Hennepin County and Special Assistant Attorney General, for the State.

*Herbert T. Park* and *Nelson & Nelson,* for respondent.

*Keyes, Pardee, Solether & Carr, amici curiae,* filed a brief in support of the contention of the State.

STONE, JUSTICE.

Two cases consolidated here. One, No. 31,609, is referred to in argument as the Owatonna case; the other, No. 31,789, as the Minneapolis case. In the former the Trustees of Pillsbury Academy, a corporation, proceeding under L. 1935, c. 300, ask what amounts to a declaratory judgment that the involved real estate, situated in Steele county and owned by the academy, is exempt from taxation. The Minneapolis case is a statutory proceeding for the collection of taxes on real estate owned by the academy. The latter, by answer, asserts the same claim to exemption. In both cases decision was against the state, and it appeals from the resulting judgments. They sustain the claim that Pillsbury Academy was, by an act of the territorial legislature, granted an irrepealable exemption from all taxation, which continues to bind the state under the rule of Dartmouth College v. Woodward, 4 Wheat. 518, 651, 4 L. ed. 629, 662.

By Minn. Const. art. 9, § 1, all "academies, colleges, universities, and all seminaries of learning" are "exempt from taxation." The present claim of Pillsbury Academy, from now on to be called respondent, is not based on that constitutional exemption. That is because in both cases the real estate is not presently used for school purposes, other than that the net income goes into respondent's funds. Hence the property is not within the general constitutional exemption. State v. Carleton College, 154 Minn. 280, 191 N. W. 400.

The controlling facts make a brief history of respondent. The narrative begins with L. 1854, c. 36, entitled "An act to incorporate the Minnesota Central University." It consisted of 14 sections and contemplated an "institution of learning" at a place to be designated by the trustees "on the West side of the Mississippi, between the mouth of Rum River [Anoka] and Lake Pepin." That institution was to be "erected on a plan sufficiently extensive to afford ample facilities to perfect the scholar."

368

Section 11 declares that "all corporate property belonging to the institution, both real and personal, is, and shall be free from taxation." On that pronouncement of the territorial legislature is based the present claim to continuing, complete, and irrepealable exemption from taxation.

The Minnesota Central University was organized pursuant to L. 1854, under the patronage, as that charter intended, of the then Minnesota Baptist Association. It was located at Hastings in 1857 and functioned there for a time. Owing to the vicissitudes of the period, it lost its Hastings real estate under foreclosure in 1861.

In 1857 and again in 1858 the law of 1854 was amended in particulars not now important. Many years may now be passed by the simple statement, taken from respondent's brief, that "during the period beginning 1867 to the taking over of Minnesota Academy [now respondent] under the act of 1878, no classes were conducted by the corporation."

In 1858 Minnesota was admitted to the Union. Its constitution declared, art. 9, § 1, that: "* * * taxes * * * shall be as nearly equal as may be; and all property on which taxes are to be levied shall have a cash valuation, and be equalized and uniform throughout the state." Section 3 went on to say: "Laws shall be passed taxing all * * * property, according to its true value in money." Those provisions remained through 1878 and until 1906, when, by amendment, §§ 1, 2, 3, and 4 of art. 9 were superseded by the present § 1.

In 1867 the territorial charter of Minnesota Central University was again amended and "continued" by chapter 9 of the general laws for that year. The amendments are not of present interest.

At their annual meeting in 1877 the trustees of Minnesota Central University passed this resolution:

"* * * that in view of the practical present abandonment of the work of the Minnesota Central University, all the books, moneys, securities, and personal property of whatsoever description, belonging to said corporation, be and the same are given, granted, conveyed and transferred to 'The Baptist Centennial Committee of the

State of Minnesota'; and that the secretary of this board be, and is, hereby, authorized and instructed to deliver all such property to the said committee, and to execute in behalf of this board, suitable written conveyances and transfers of the same."

■ In 1878, when the corporation was in the moribund condition just indicated, the state legislature passed Sp. L. 1878, c. 69. Its title reads:

"An Act to Amend Chapter Number Thirty-six (36) of the Session Laws of One Thousand Eight Hundred and Fifty-four (1854), Being an Act to Incorporate the Minnesota Central University, Passed by the Legislative Assembly of the Territory of Minnesota, Approved March Fourth, One Thousand Eight Hundred and Fifty-four (1854)."

Both title and text speak in terms of mere amendment. But what was actually done was the creation of a new, rather than the confirmation of an old, corporation. It is but another case where the phraseology of characterization does not control as against real substance.

Section 1 declared: "That there *be established* in the city of Owatonna * * * an institution of learning by the name of the Minnesota Academy." A board of trustees was then named consisting in part of the then trustees of Minnesota Central University. The trustees "and their successors" were declared to "be and they are *hereby created* [all italics ours] a body politic and corporate to be styled the trustees of Minnesota Academy." They were directed to have and use a common seal and to make and alter by-laws.

Section 5 fixed the time for the *first* meeting of the trustees "to organize."

Section 11 declared that "all corporate property belonging to the institution * * * is and shall be free from taxation."

Section 12 refers to "the board of trustees *created* by this act." Then, by language in the present tense, the new trustees were "invested with all the property, real, personal and mixed, and all rights of action now held or possessed by the trustees of the Minnesota Central University," whether in the latter's possession or

held in trust, as some of it was, by the Baptist Centennial Committee of the State of Minnesota (the Baptist Centennial Committee was then itself a subsidiary to the Baptist State Convention).

By § 10 of the law of 1878, §§ 4, 7, 13, and 14 of the act of 1854 "and all acts or parts of acts inconsistent with this act is hereby repealed." Section 4 of the old law was the one fixing its location and giving the Minnesota Central University the scope and objectives of a university rather than a college or academy. Section 7 had prescribed a special method of serving a summons on Minnesota Central University. Section 13 had expressly given the old institution the power to establish a preparatory department. Section 14 simply covered the item of calling the first meeting of its first trustees.

Thus, from the simple combination of verbs in the present tense with their subject nouns, the intention to create a new corporation by the law of 1878 is plain. It is unimportant that the institution was given a new name. But it is of significance that this rechristening, with its context, shows an intention to reduce the enterprise from university to academy status and purpose. That idea, where not expressed, is implicit throughout the whole law of 1878. Gone is the old purpose "to perfect the scholar." Gone also the thought that the new corporation needed express statutory leave for a preparatory department. Finally the new institution was denied the express power, possessed by its predecessor, to confer "all honors and degrees as are usually conferred by the most learned institutions in the United States." L. 1854, c. 36, § 1.

Doubtless because of the restricted ambition of the new academy, the limit of its permissible annual income was fixed at $30,000. That maximum for the Minnesota Central University had been $70,000.

In sum, the law of 1878 speaks, as to purpose, wholly in terms of creating a new entity and not at all in words suggesting that any existing unit was being continued or confirmed. The operative and primary declaration of purpose was environed by secondary indicia that creation of the new rather than confirmation of the old was the one objective. In striking contrast is L. 1867, c. 9,

which "continued" the territorial charter of Minnesota Central University. So also is art. 8, § 4, of the state constitution. It "perpetuated" the then franchises of the University of Minnesota. State ex rel. University of Minnesota v. Chase, 175 Minn. 259, 220 N. W. 951. If the purpose had been simply to continue the old entity, it was already "invested" with the "property, real, personal and mixed, and all rights of action," with which, notwithstanding, the law of 1878 "invested" respondent.

It is noticeable that the law of 1878, while careful to see that the corporation created thereby was "invested" with all the property of its predecessor, omitted anything subjecting it to the latter's debts. It seems clear, therefore, that the new entity, in the absence of its express assumption of them, could not have been held liable thereon. Huff v. Winona & St. P. R. Co. 11 Minn. 114 (180).

So Minnesota Central University was not continued by Sp. L. 1878. Instead, a new corporation, the present respondent, was thereby created to take as its own the new charter and all there was of property of the old Minnesota Central University. No other conclusion is tenable under the authorities and upon the facts. Ames v. L. S. & M. R. Co. 21 Minn. 241. Respondent was organized and carries on under the law of 1878. By Sp. L. 1887, c. 330, its name was changed to Pillsbury Academy.

True, if either on its face or in application to its subject matter we could find reasonable ground upon which to declare the law of 1878 constitutional rather than otherwise we should do so. The existence of that rule no one denies. We are convinced, however, that the purpose of the law to create a new corporation is, by the plain language of the law itself, put beyond question. If that be so, as we think it is, it would be improper to control decision by any extraneous aid to interpretation. Such rules as that requiring a holding of constitutionality, if it is possible, are not to be used first to create ambiguity by construction and then to remove it by the same process.

Considering the problem a bit further, this observation seems appropriate. If the law of 1878 were to be sustained as legitimate amendment, the result would be this: Before our constitutional

prohibition of special legislation, art. 4, § 33, adopted in 1881, the legislature could have taken any corporate charter granted by territorial law (there were many of them) and, by a new act labeled as a mere amendment, brought into being a new corporation with franchises unlimited, both as to number and content, although that process had been barred from the beginning by the state constitution. If the result is to thwart a constitutional mandate, what is in effect wholly new law cannot be changed into old law by the mere expedient of calling it old.

Recurring to Ames v. L. S. & M. R. Co. 21 Minn. 241, it is both interesting and instructive to note that while the involved amendatory act was sustained on a rehearing it was with express misgiving and only because the court did [21 Minn. 288] "not feel that certainty of conviction" necessary to enable it to hold the statute unconstitutional. With an illuminating generalization that exactly fits this case, the decision is qualified and limited by this declaration (21 Minn. 284):

"That a legislature might, in such a case, misapprehend the legal effect of the act passed by it, just as it might mistake as to the limits of its constitutional power, is possible. It might, without intending to create a new corporation, attempt such radical and essential changes in the constitution of an old one as to amount to the creation of a new one; and if such must be the necessary result of such changes, the act must be just as clearly within the constitutional prohibition as though the legislature actually intended the result, and fully understood that such would be the effect of its act."

We are unable either to uproot or plow around that proposition. It appears inherently sound and self-sustaining. We consider that it makes our conclusion impregnable.

■ This is not a case where, as argued for respondent, the legislature merely gave an existing corporation a new name and a new wardrobe of franchise and privilege. The latter was offered and accepted, but to and by a new corporation. The trouble is that

one of the new garments tendered by the legislature, immunity from taxation, the legislature had no constitutional power to give.

In 1878 our state constitution did not have its present prohibition (added in 1906) that "the power of taxation shall never be surrendered, suspended or contracted away." Art. 9, § 1. But even then the state could not grant to any corporation, new or old, an immunity from taxation. That is because art. 9, § 3, of the constitution, as it then was, made it imperative that "Laws shall be passed taxing all * * * property" of which exemption is not permitted (by the constitution). Precluded thereby was any exemption other than those specified in § 3, which did not include property of an educational institution not used for educational purposes. (State v. Carleton College, *supra.*) It was expressly so held in Le Duc v. City of Hastings, 39 Minn. 110, 38 N. W. 803.

By the law of 1878, § 8, the legislature attempted to grant to respondent the immunity of taxation on which is based its claim to exemption. It could not do so because of the constitutional bar just mentioned. For this jurisdiction the law is so settled by State v. G. N. Ry. Co. 106 Minn. 303, 119 N. W. 202, and its companion case, State v. C. G. W. Ry. Co. 106 Minn. 290, 301, 119 N. W. 211, 213. In the latter it was said that not only would an attempt at original grant of such an immunity to a new corporation be prevented by the constitution, but also that "the legislature could no more grant this special privilege by the revival of an old corporation than it could confer a" similar immunity "upon an entirely new company."

In this field of alleged impairment of contractual immunity from taxation the cases are numerous, and all that retain authority are against respondent. Even where the privilege has had initial existence for one grantee, the most studied and formal attempt of legislatures to recognize or confirm it in a successor, or in a mere revival of its first corporate holder, have been held ineffectual if a constitutional bar has intervened.

In Trask v. Maguire, 85 U. S. (18 Wall.) 391, 409, 21 L. ed. 938, it was held that a constitutional prohibition of special forms of or exemptions from taxation applied "in all its force against the renewal of an exemption equally as against its original creation."

Upon that ground State v. G. N. Ry. Co. *supra,* was affirmed (with title reversed) by the Supreme Court of the United States (216 U. S. 206, 30 S. Ct. 344, 54 L. ed. 446). Therein are cited and somewhat reviewed, as in accord, the following additional cases: Morgan v. Louisiana, 93 U. S. 217, 23 L. ed. 860; Louisville & N. R. Co. v. Palmes, 109 U. S. 244, 3 S. Ct. 193, 27 L. ed. 922; Memphis & Little Rock R. Co. v. Railroad Commrs. 112 U. S. 609, 5 S. Ct. 299, 28 L. ed. 837; Atlantic & G. R. Co. v. Georgia, 98 U. S. 359, 25 L. ed. 185; Keokuk & Western R. Co. v. Missouri, 152 U. S. 301, 14 S. Ct. 592, 38 L. ed. 450; Yazoo & Miss. Valley Ry. Co. v. Adams, 180 U. S. 1, 21 S. Ct. 240, 45 L. ed. 395.

By the decision in the Great Northern case (106 Minn. 303, 119 N. W. 202); First Division St. P. & P. R. Co. v. Parcher, 14 Minn. 224 (297), and quite a catalogue of similar cases following it were in part distinguished and impliedly at least disapproved. Whether and to what extent they were thereby overruled is now of no more than historical interest. For this case the law is settled as above stated.

■ The state questions the power of a territorial legislature to make a contract, in respect to taxation, binding upon the future state. We pass that point without decision, but with this comment. The intention of the federal constitution is that states, on admission to the Union, shall adopt their own constitutions with the republican form of government guaranteed. So the argument is not easily disposed of that, subject only to the federal constitution, each state government was to have, unimpaired, all the power of sovereignty.

The time may be ripe to reopen and reconsider the question whether a state's power of taxation, any more than that of police or eminent domain, may be bartered away, substantially limited, or impaired by act of its own legislature. It is settled that the police power and that of eminent domain may not be so trammeled for all time. With important limitations, the rule is established that the power of taxation, just as much and as vitally an attribute of sovereignty, may be subject to contract limitation. That view has

always met with strong and persuasive resistance. Always it has been questioned by eminent authority, and upon reason not easily demolished. We do not discuss the problem further because it has not been argued. We do not consider it forever closed. See note, "Corporate taxation in the United States as affected by the contract clause in the Federal Constitution," 60 L. R. A. 33.

There remains another objection to respondent's claim of contract right which is well founded. We now assume that the original corporation, while it was a going concern and performing on its side what it claims was a contract, first with the territory and then with the state, had the now challenged exemption from taxation. But, before 1867, there had been a complete abandonment of its project by the Minnesota Central University. For that very reason, all its property was transferred unconditionally to the "Baptist Centennial Committee of the State of Minnesota."

There was no contract between the territory and the Minnesota Central University unless there was consideration moving from the latter. Wisconsin & Michigan Ry. Co. v. Powers, 191 U. S. 379, 24 S. Ct. 107, 48 L. ed. 229. That consideration, if any, was the establishment and maintenance of the contemplated educational institution. Both contract and consideration were continuing. If the consideration failed, the contract as such lapsed. The consideration had failed sometime between 1858 (when the constitution was adopted with its prohibition of tax exemptions) and 1867. Plainly, therefore, if the corporation was continued and reënfranchised by the act of 1878, the process was subject in all things to the state constitution.

True, while for some years before 1878, and as early as 1867, the charter of the old corporation was subject to forfeiture, it was not forfeited. But in that condition of major and continuing default by the university, as a contractor with the state, the state could enact no valid affirmative legislation to resurrect and continue this lapsed contract, except within the limitations imposed by the state constitution. Treated as a contract, the act of 1878 was new, and even if with the old corporation it was a substitute for the original contract. The corporation, new or old, accepted it. It was then

subject to any and all limitations upon the power of the state to make such a new contract.

If the exemption was at the beginning a right rather than a privilege, it ceased to be a right and became a mere privilege of the Minnesota Central University when its enterprise was abandoned. In that status, it could have been revoked at any time by the state. 1 Cooley, Constitutional Limitations (8 ed.) 572; Wisconsin & Michigan Ry. Co. v. Powers, *supra*. There could be no more solemn act of revocation than the constitutional prohibition, effective since 1858, of all such exemptions from taxation.

For more than ten years before 1878 the Minnesota Central University had been in complete and destructive default, as a contracting party, under its charter. The latter then, as a law, had become repealable for that default. The rule is, without exception, that "repealable contracts of exemption become immediately subject to the provisions of the new organic law." Note, 60 L. R. A. 49. So, after the constitution was adopted in 1858, the abandonment of its project by the Minnesota Central University made its exemption repealable and repealed. Hence the immunity was defunct—had been for ten years in 1878. The new charter of that year could no more put life into the dead body of the exemption than it could generate the living tissue for a new one. Resurrection and generation of such an immunity were equally forbidden.

It follows that respondent does not have, and under the constitution cannot have, the immunity from taxation which it claims and the supposed existence of which was the only basis for the decision below adverse to the state. In consequence, the judgments in both cases must be reversed and the causes remanded with directions to enter judgments for the state.

So ordered.

GALLAGHER, CHIEF JUSTICE (dissenting).

While in full sympathy with the result reached by the majority of the court, I cannot reconcile myself to the reasoning used in arriving at such result. To me it seems clear that when the legislature adopted Sp. L. 1878, c. 69, it intended to continue in exist-

ence the corporation created by L. 1854, c. 36, and did not intend to create a new corporation. As pointed out by Mr. Justice Loring in his dissenting opinion, it did not possess the power to create a corporation by special act. It follows that the present corporation, successor to the one created by the act of 1854 (c. 36), is entitled to the benefit of the tax-exempt privilege afforded by the act and that both appeals should be affirmed.

LORING, JUSTICE (dissenting).

I find myself in disagreement with the views expressed by the majority. The questions presented are: (1) Was the act of 1878 an amendment of the territorial act of 1854 as amended? (2) If it was, did the corporation lose its tax immunity by any charter provision or act of the sovereignty? The majority construes Sp. L. 1878, c. 69, as creating a new corporation. This the legislature was then specifically forbidden to do by Minn. Const. art. 10, § 2. There is a well established rule of construction that when an act of the legislature is susceptible to two constructions one of which results in the act being unconstitutional and the other permits it to be held constitutional, the latter construction if reasonable should be adopted. I do not concede in this case that the construction of c. 69 adopted by the majority is a tenable one; but, assuming for the moment that it is, that construction makes the act a violation of art. 10, § 2, then and now in our state constitution, which prohibits the creation of corporations by special act except for municipal purposes. Either the legislature amended the corporate charter or it did nothing, because it could not by special act create a new corporation.

The title and the whole tenor of c. 69 was that of an amendment to the territorial law which created the corporation originally. Each section which was amended "to read as follows" used the original language of the act of 1854 except in the changes subsequently noted. Thus the words "be established" and "hereby created" were in the territorial act and were merely repeated in the amendment. This explains and deprives of significance the use of the present tense deemed so important by the majority. Under our

378

decisions this method of amendment merely continued the old provisions in force. It did not enact new law. The present tense relates back to the time of the original act. The amendments incorporated new language only so far as was necessary to change the name of the corporation, the location of its activities, reorganize the board of directors, and modify the nature of the degrees which might be conferred by the institution. It was still an educational institution, it was still under the patronage of an organization connected with the Baptist Church. True, it provided for a transfer of property from the old board to the new, a provision which was probably unnecessary, but wholly beyond constitutional sanction if the legislature was creating a new corporation and attempting to expropriate property of the old and without compensation vest title to it in a new corporate entity. This provision is a further indication that no new corporation was intended. Here again we must assume that the legislature intended to do what it had a right to do, merely providing for the internal affairs of the corporation. In all other respects substantially all of the important provisions of the original act, including in identical language the immunity from taxation, were again recited in the amending act. Under well known and fundamental principles with reference to the construction of an amending statute, insofar as its provisions are the same as those of the original act they are but a continuance of the original provisions, which are regarded as in force from the date of the original act. The provisions of the original act were "the law all the time." 6 Dunnell, Minn. Dig. (2 ed. & Supps.) § 8925, and cases cited. Against all this, can it be of controlling importance that the field of corporate activities was somewhat reduced in size? And by an act wholly within the legislative power? The fact that the debts of the corporation were not mentioned in the act of 1878 indicates that the legislature thought that it was merely amending the charter. The debts, if any, would still stand against the corporation.

The majority apparently place much reliance upon the case of Ames v. Lake Superior & M. R. Co. 21 Minn. 241. In my opinion

this case, properly interpreted, is one of the strongest authorities for the respondent. In 1857 the territorial legislature by special charter created the Nebraska & Lake Superior Railroad Company, a corporation which never organized by the choice of officers nor issued stock until after 1861, when the state legislature passed an act amending the special act of 1857. The act of 1861 changed the name of the corporation, the names of the incorporators, and the route of the railroad. As said on page 256, *et seq.* of the original opinion in the Ames case:

"In appearance, at least, these are two distinct and independent corporations, with franchises and powers essentially and radically different. They resemble each other in this, that each is a railroad corporation, and the provisions of the two charters prescribing the mode of obtaining subscriptions for stock, the mode of organization, and the powers and duties of the officers, the manner in which the road may be located, and the right of way obtained by condemnation of property, and certain other provisions of the two charters, are the same. They resemble each other as much as and no more than would two companies organized under the general railroad law, the one for the purpose of building a road from Lake Superior to Nebraska, and the other for the purpose of building a road from Duluth to St. Paul. They differ in name, in the corporators who compose them, in the route of the railroads they may construct, in the nature and object of the enterprises they are empowered to undertake."

The court then adds (p. 257):

"It is not denied that very considerable change may be made in the charter and the membership of a corporation, without destroying its identity. The membership of a corporation aggregate is continually changing as shares are transferred by one person to another, the corporation remaining the same. A corporation may, by authority from the legislature, (in the absence of any constitutional restriction upon the power of the legislature in this particular,) and with the assent of the shareholders, engage in new enterprises, foreign to those contemplated in the original charter, without be-

coming a new corporation. The name of a corporation, like that of an individual, may be changed without destroying its identity."

Coming then to the opinion by Chief Justice Gilfillan on the rehearing, in discussing the form of the act of 1861, the court said (p. 283) :

"It purports to be, is expressly declared to be, an amendment of a former law, and not an original act. This is significant of the actual intention of the legislature—of what was in its mind in passing the act. It shows that the legislature actually intended—it is a declaration of such intention—that the provisions of the act should apply and relate to the corporation and franchises created and granted by the act of 1857, and not to any other.

"It is possible for the legislature, in such case, to act dishonestly; to intend the creation, by such means, of a new corporation; to attempt to do what the constitution forbids, under the pretence and color of doing what it permits. We have no right, however, to assume that it had any such motive. When it in substance declared that the provisions of the act of 1861 were intended to apply only to the corporation created, provided for, and regulated, by the act of 1857, we are bound to presume that such was its honest intention.

"And if there was no actual intention on the part of the legislature to create a new corporation, instead of providing for and regulating one already existing, then no such corporation was created by the act, unless the character of its provisions is such that, if permitted to be operative, the act did necessarily, in legal effect, create a new corporation, although such effect was not in the mind of the legislature."

Then follows the paragraph of *obiter* quoted by the majority; after which the court goes on (p. 284) :

"There being no actual intention by the legislature to create a new corporation by the act of 1861, the inquiry is brought down to this: Did the provisions of the act so radically and essentially change the original act that, if operative, the amending act must necessarily have the legal effect to bring into existence a new cor-

porate body, notwithstanding the legislature did not intend such result? that is, was the corporation, as defined by the act of 1861, necessarily and inevitably another and different legal entity from that created by the act of 1857?

"The changes made by the act of 1861, which are claimed to have brought about that result, are in the names of the corporators, and in the route or line of railroad, that is, in the enterprise or business, which the corporation was created and authorized to prosecute."

The court comments upon the fact that a change of name or a change in the incorporators would not affect the identity of the corporation and goes on to discuss the effects which the modification of the enterprise which it is authorized to carry on would have upon its identity. The court then further said (p. 288):

"We have already expressed our opinion that, when a corporation is created for the purpose of prosecuting an enterprise the extent of which is defined by the act of incorporation, the legislature may relieve the corporation from the prosecution of a part of the enterprise as originally defined, without changing the character of the corporation; so, also, the legislature, with the consent of the corporation, may limit the exercise of the corporate franchise to only a part of the original enterprise, without any such effect."

Then, in commenting upon the various changes made by the act of 1861, the court concluded (p. 289):

"The legislature found in force an act under which there was an existing, unorganized corporation, and by the act of 1861, it undertook, not to leave it in force precisely in its then form, nor entirely to repeal it, but to give to the existing corporation a new name, to provide, for the purpose of organizing and setting it in operation, a new set of corporators in the place of those who had neglected that duty, and to make such modification of the enterprise of the corporation as, in its opinion, the public interests justified."

This is the case which the majority regard as fortifying their conclusion to the point of impregnability!

The case at bar is infinitely stronger for the respondent corporation than was the Ames case. The Minnesota Central University was actually organized, acquired property, and engaged in the purposes for which it was organized. The Nebraska & Lake Superior Railroad Company never organized as a corporation nor acquired any property nor engaged to any extent in the business for which it was organized; and yet, after the adoption of the state constitution, which forbids the creation of a railroad company by special charter, the action of the state legislature in amending the territorial charter was sustained although it changed the name of the corporation, changed the incorporators, and restricted the business to a different field, which was exactly what the legislature did by the act of 1878 in the case at bar.

Did the corporation lose its immunity by failing to carry on its educational functions? Contrary to the findings in both cases, I shall assume that it is true that owing to the vicissitudes of the Civil War period and the years immediately following it the work of the corporation was interfered with and temporarily abandoned. On this account, personal property belonging to the corporation was transferred to the Baptist Centennial Committee of the State of Minnesota. In the resolution quoted by the majority no intention whatever is indicated of giving up the corporate franchise or dissolving the corporation. By transferring its personal property the corporation did not incapacitate itself from discharging in the future its corporate powers and duties. It could resume its functions at any time precisely as it began to do in the first instance. As said in Richards v. Minnesota Sav. Bank, 75 Minn. 196, 204, 77 N. W. 822, 823:

"* * * in the absence of any action on the part of the state, a surrender or abandonment of its corporate franchise, and an acceptance thereof by the state, cannot be presumed from its transfer of its property and continued nonuser of its franchise. It remained an inactive corporation, and had the right to resume the exercise of its franchise * * * unless the state interfered."

This was said with reference to a savings bank which for 16 years did not use its corporate franchise after it had transferred its assets and business to another bank. The court said further [75 Minn. 204]:

"It did not abandon its franchise, but simply ceased to exercise it for a time. It did not do any act which incapacitated it, or rendered it legally impossible, to resume business."

See also Moe v. Harris, 142 Minn. 442, 172 N. W. 494, where a private corporation never even had any paid-in capital or issued any stock.

Of course if in the original charter, as in the case of the Minnesota & Northwestern Company involved in State v. C. G. W. Ry. Co. 106 Minn. 290, 298, 300, 119 N. W. 211, there had been a provision that in case of default in the terms of the charter all grants and rights thereby conferred *"shall cease and be void,"* another question would be presented. 7 Fletcher, Cyc. Corp. (Perm. ed.) § 3346. But here we have no such provision, and no action was taken by the sovereignty to nullify corporate rights or immunities, 8 Fletcher, Cyc. Corp. (Perm. ed.) § 4087. On the contrary, by the various amending acts the sovereignty recognized the continuance of the corporation.

If c. 69 did not create a new corporation but merely amended the charter of the old corporation, the case of State v. G. N. Ry. Co. 106 Minn. 303, 119 N. W. 202, relied upon by the majority, is not applicable, for in that case there was an attempted transfer of the gross earnings tax limitation, originally granted by the territorial legislature to the Minnesota & Pacific Railroad Company, to the St. Paul & Pacific Railroad Company and later to the First Division of the St. Paul & Pacific Railroad Company and still later to the St. Paul, Minneapolis & Manitoba Railroad Company, which leased its line to the Great Northern. This court expressed a doubt that the original gross earnings tax law which the territorial legislature passed for the benefit of the Minnesota & Pacific Railroad Company was intended as an arrangement which should continue for all time but thought that it was to be in force only so long as the company

complied with the terms by making the annual payments. The court held that the tax limitation did not become attached as appurtenant to the charter, rights, franchises, and privileges of the corporation so as to pass to its successors. The court quoted with approval the language of the United States Supreme Court in Morgan v. Louisiana, 93 U. S. 217, 23 L. ed. 860, where that court held that immunity from taxation was not one of the positive rights or privileges without the possession of which the road of the company could not be successfully operated, and held that the immunity was personal and incapable of transfer without express statutory authority.

In the Great Northern case all the rights of the old Minnesota & Pacific Company had been acquired by the state by foreclosure sale which carried all the rights, property, immunities, and franchises of the company. The Supreme Court of the United States held that those rights then belonged to the state and that the legislature of the state could not, after the state constitution went into operation, have reinvested the old railroad company with such property, rights, immunities, or franchises or have transferred them to a new corporation or to a consolidated railroad corporation accompanied by an exemption from taxation that was inconsistent with the constitution.

We need not here discuss the question of whether the present corporation, if newly created by the act of 1878, is a corporation de facto. That question is beside the point. We have before us a simple question of statutory construction. Did the legislature intend to amend a charter or create a new corporation? Certainly it did not intend to create a corporation de facto. If it intended to create a new corporation it intended to create a corporation de jure. That it could not do by special act against the constitutional prohibition. Hence the conclusion is irresistible that it intended to amend the old charter.

If I am correct in concluding that the corporation involved in the case at bar is the same corporation that was organized under the territorial act, then the question of whether or not it had a contract for tax exemption becomes a federal question, and we must

be guided by the rulings of the Supreme Court of the United States, which will exercise its independent judgment on the question before us.

The majority cite the case of State v. C. G. W. Ry. Co. 106 Minn. 290, 301, 119 N. W. 211, 213, and quote the following language: "The legislature could no more grant this special privilege by the revival of an old corporation than it could confer a" similar immunity "upon an entirely new company." Severed from its context and from the facts that the court had under consideration, this statement may lend some color to their conclusion, but the court was there considering a special charter which by territorial amendment contained a provision requiring the company to construct and equip 50 miles of its road within three years after the passage of the amendment, and the entire line within six years, [106 Minn. 298] "in default of which, * * * the charter of the company and all grants and rights thereby conferred 'shall cease and be void.'" There was also a clause reserving to the legislature the right of amendment after the expiration of 20 years. For 30 years after its organization the company did nothing toward complying with the conditions of its charter, and this court said [106 Minn. 298]: "By this failure the company forfeited all its rights under the charter, and all grants thereby conferred 'ceased and were void.'" However, thereafter the legislature by Sp. L. 1883, c. 83, recognized the continued existence of the corporation and authorized the construction of a line of road differing somewhat from that authorized by the original charter. The line was constructed and completed sometime in the year 1885 and operated until 1887, when the company transferred all its property and rights to the Chicago, St. Paul & Kansas City Railroad Company, which in turn leased to the Chicago Great Western. In commenting upon the situation this court said [106 Minn. 300]:

"Under the language of the charter, all its rights therefore *'ceased and were void,'* and the charter could have been forfeited by appropriate action of the state. But no proceedings were taken for that purpose, and it may be conceded that the act of 1883 was a

recognition of the legal existence of that company at that time and a waiver of the right to declare a forfeiture. But such waiver and recognition were clearly subject to the then existing constitutional mandate prohibiting the granting of special privileges on the subject of taxation."

Then follows the language quoted by the majority:

"The legislature could no more grant this special privilege by the revival of an old corporation than it could confer a one per cent. privilege upon an entirely new company."

From what I have previously said it is obvious that the court was dealing with a corporation which by the terms of its original charter itself had lost its tax immunity. This tax immunity could only be revived at a time when the legislature had the power to grant the right. It did not have that power at the time when it attempted to do so, whereas in the case at bar there was no such provision in the original charter or any provision which stated that failure to accomplish its objective should *ipso facto* terminate its rights or its immunities. If the Minnesota Central University, at any time during the period when it was not performing the purposes for which it was organized, had acquired property, it would have been entitled to tax immunity under its charter, which had not ceased or become void. When in 1878 the legislature of the state amended its charter, it did not seek to restore a right which the corporation had lost, as it subsequently did in the case of the Minnesota & Northwestern Railway (106 Minn. 300), but merely extended its recognition to the continued legal existence of the corporation with rights and immunities which it had never lost or forfeited either by the terms of its original franchise or by subsequent action of the sovereignty. In the case of the Minnesota & Northwestern Railway there was something more than an attempt at a recognition of a continued legal existence of the corporation. There was an attempt to revive in the railroad company a right which by the very terms of the original charter had ceased and become void. To me the distinction seems clear.

The majority cite Trask v. Maguire, 85 U. S. (18 Wall.) 391, 21 L. ed. 938. In that case the Supreme Court had before it a situation where the corporation had lost all its rights to the state upon foreclosure, and the court there held that upon repurchase by the state all rights and immunities ceased and became reinvested in the state and the legislature could not revive that immunity in a new corporation against a constitutional prohibition that had been adopted in the meantime.

Quite obviously an educational institution fighting against the vicissitudes of pioneer conditions and those existing during and following the Civil War should not be subjected to such strict provisions in regard to forfeiture as would a railroad company organized for profit. Doubtless the first consideration entered into the drafting of the original charter and the subsequent ones into the lenient attitude of the state government toward the corporation during the period mentioned.

To summarize, I think Sp. L. 1878, c. 69, was an amendment of L. 1854, c. 36, and not an attempt to create a new corporation; that the corporation never lost its tax immunity by any charter provision or by any act of the sovereignty; on the contrary, the various amendments to the act of 1854 showed not only recognition of the corporation but consent to its continuance; that the provision for tax immunity in the act of 1878 was not an attempt at revival of a lost right, contractual in its nature, which the corporation possessed by virtue of its territorial charter and which it had lost either by the terms of the charter or otherwise. It is not in our power to provide a remedy for the improvidence of the territorial legislature. We should not do it by saying that the legislature intended to create a new corporation when to do so was obviously in flagrant violation of a plain constitutional prohibition which even the most inexperienced member of that body could not fail to understand. We should not attempt to do it by "uprooting or plowing around" universally accepted canons of statutory construction or by attributing to the legislature a purpose, in bad faith, to circumvent the constitution, a purpose without support in the record and one which we should find only upon the clearest of proof.

If there were before us as a matter of first impression the question of whether the sovereign right of taxation is subject to being contracted away, I should take the view that it is not. I should like to see that question reconsidered by the Supreme Court of the United States.

In my opinion, the decisions of the two learned trial judges should be affirmed. The finding of ownership in the Hennepin county case I think is sustained by the record.

MR. JUSTICE HILTON, incapacitated by illness, took no part in the consideration or decision of this case.

