TRUSTEES OF HAMLINE UNIVERSITY OF MINNESOTA v.
H. I. PEACOCK AND OTHERS.
STATE v. TRUSTEES OF HAMLINE UNIVERSITY
OF MINNESOTA.[1,2]

May 19, 1944.

Nos. 33,531, 33,533.

[1]Reported in 14 N. W. (2d) 773.

[2]Certiorari denied by United States Supreme Court, October 9, 1944.

*Michael J. Dillon,* County Attorney, *Frank J. Williams,* Assistant County Attorney, and *Karl W. Windhorst,* Special Assistant County Attorney, for appellant State of Minnesota in Case No. 33,531.

*James F. Lynch,* County Attorney, and *Andrew R. Bratter,* Assistant County Attorney, for appellant State of Minnesota in Case No. 33,533.

*G. A. Youngquist, Donald E. Bridgman, W. P. Westfall, John F. D. Meighen, James H. Hall, F. W. Thomas,* and *Fowler, Youngquist, Furber, Taney & Johnson,* for respondent.

JULIUS J. OLSON, JUSTICE.

We have here appeals from two judgments rendered in and by the district courts of Hennepin and Ramsey counties sustaining the

claim of Hamline University of Minnesota (hereinafter referred to as "Hamline") that certain real estate owned by it is immune to general taxation. Since both cases involve that determinative factor as the basis for decision, we proceed directly to that issue.

The properties sought to be taxed are not directly devoted to any of Hamline's educational functions. We are concerned here only with real estate owned by it devoted to commercial and other kindred activities for which it receives rental income from its tenants. All these properties represent investments from its endowment fund, which, with other income investments such as mortgages, bonds, and the like, now amount to approximately $2,000,000. The value of its educational plant and facilities is nearly $1,000,000, but that, of course, is not involved in this litigation. The income from the mentioned properties, including that derived from other investments of its endowment fund, is needed and necessarily required by Hamline in carrying on its educational functions.

Hamline's freedom from the general burden of taxation shared by other taxpayers has for its foundation the legislative grant of claimed immunity contained in the territorial charter creating Hamline "a body politic and corporate" for the stated purpose of affording "ample facilities to perfect the scholar." L. 1854, c. 43, §§ 1, 4.

The provisions and requirements of the act were promptly accepted on May 9, 1854, when Hamline's trustees held their first meeting. On July 12 they decided to establish a preparatory department, then considered an immediate necessity, since high schools within the territory of Minnesota were practically unknown. That department was opened in November with an enrollment of "18 ladies and 21 gentlemen." The college proper opened in 1857, and its courses included "Mental and Moral Sciences, Belles Lettres, Ancient Languages, Mathematics, Natural Sciences, Law, Biblical Literature, Music, and German." Thus it became, and until 1869 remained, the only institution of college rank in this state. The first college class was graduated in 1859. During the following years the number of its students ranged from 18 to 60 in the college department, and from 73 to 182 in the preparatory department.

Financial difficulties beset the trustees almost from the start. The 1857 panic visited this region, then undeveloped and sparsely settled, as it did the country at large. When the effects of that had somewhat subsided, the Civil War broke out, further complicating the already precarious financial condition of the new college. Thus, in the spring of 1869, debts and operating expenses had so far depleted its treasury and even its credit that the commencement exercises had to be held in March instead of in June.

During the fall of 1869, because of the financial difficulties facing them, the trustees were in a dilemma. The new state had gone through the trying days of the Civil War and the Indian uprisings and had suffered generally from grasshopper and other insect plagues. With a depleted treasury and no credit upon which to lean, the trustees concluded to suspend the activities of the institution for the time being. However, they met officially many times and by various means sought to reopen the college, never surrendering their determination to make the institution a going concern. As a matter of fact, committees were appointed to get various cities in the state to make propositions of financial help in consideration of having Hamline moved from Red Wing, where it was originally built, to one of these new locations. The creation of an endowment fund was sought. Proposals came from Red Wing, Faribault, and Rochester. In 1871, the legislature passed Sp. L. 1871, c. 112, at the solicitation of the trustees, giving them authority to locate Hamline at such place as they might select, with certain conditions and limitations not important here. St. Paul and Minneapolis, now generally referred to as the "Twin Cities," then had a combined population of about 40,000 inhabitants. It was thought that this would afford Hamline a more satisfactory location than any of the other places we have mentioned. St. Paul offered to donate 80 acres of land (Hamline's present site), of the estimated value of $28,800. That proposal was accepted and the land conveyed. The money to meet this and other obligations came principally from these two cities, St. Paul raising $15,943 and Minneapolis $28,761. These

sums, however, were made up mostly of pledges, many of which were never paid.

A campaign for an endowment fund was begun in 1871, and total pledges of about $104,000 were secured, but many of these were not paid. After an 11-year, uphill fight for existence, the brave and persistent men who founded the institution finally succeeded in reopening both the preparatory and college departments on September 22, 1880. Ever since then its educational functions have been steadily going forward. As an institution of higher learning it is now safely on the highway of financial stability. The services it has rendered for nearly 90 years and those which it may safely be expected to render for an indefinite time in the future greatly exceed the amount of taxes now or which are likely to be involved in the foreseeable future.

Such, briefly, are the facts. To arrive at the heart of the problem before us, it may be helpful briefly to review constitutional limitations, as well as certain state and federal legislation having a reasonably direct relation thereto. These, in the order of their respective dates of passage or when they became operative, are as follows: The organic act creating Minnesota's territorial status was passed by congress March 3, 1849. Section 4 thereof provided:

"* * * the legislative power and authority of said Territory shall be vested in the governor and a legislative assembly."

The powers thus granted are found in § 6 and so far as here material provided:

"*And be it further enacted,* That *the legislative power of the Territory shall extend to all rightful subjects of legislation,* consistent with the Constitution of the United States and the provisions of this act; but no law shall be passed interfering with the primary disposal of the soil; no tax shall be imposed upon the property of the United States; nor shall the lands or other property of nonresidents be taxed higher than the lands or other property of residents"; and all legislation passed pursuant thereto "shall be sub-

mitted to the Congress," and, if by it *"disapproved,* shall be * * * of no effect." (Italics supplied.)

The territorial act giving rise to Hamline's claim of immunity to or exemption from taxation is found in L. 1854, c. 43, § 11, and as far as here material reads: "all corporate property belonging to the institution, both real and personal is, and shall be free from taxation."

On February 26, 1857, congress passed an act authorizing "the inhabitants of that portion of the territory of Minnesota which is embraced within" the limits therein fixed "to form for themselves a constitution and state government, by the name of the state of Minnesota, and to come into the Union on an equal footing with the original states, according to the federal constitution." Pub. Stat. 1849-1858, p. xli, § 1. In conformity therewith, our constitution was framed and later duly adopted by the electors of the territory. Art. IX, § 3, thereof provided (*Id.* p. lvii):

"Laws shall be passed taxing all moneys, credits, investments in bonds, stocks, joint stock companies, or otherwise, and also all real and personal property, according to its true value in money; but * * * academies, colleges, universities, and all seminaries of learning * * * shall, by general laws, be exempt from taxation."

Under the heading "SCHEDULE" (p. lxii) it was provided:

"Sec. 1. That no inconvenience may arise by reason of a change from a territorial to a permanent state government, it is declared that all rights, actions, prosecutions, judgments, claims and contracts, as well of individuals as of bodies corporate, shall continue as if no change had taken place; * * *

"Sec. 2. All laws now in force in the territory of Minnesota not repugnant to this constitution, shall remain in force until they expire by their own limitation, or be altered or repealed by the legislature."

On May 11, 1858, congress enacted (p. lxx):

"That the state of Minnesota shall be one, and is hereby declared

to be one of the United States of America, and admitted into the Union on an equal footing with the original states, in all respects whatever."

With these constitutional and legislative directions in mind and aided and guided by both state and federal decision law, we approach the problems presented by counsel. While many interesting sidelight issues are discussed in their briefs and reliance placed thereon, we shall try to confine our consideration and determination only to those which we deem decisive of the main issue, i. e., whether Hamline's real property not directly devoted to its educational functions is immune from the state's power to tax it.

In the Hennepin county case (No. 33,531), counsel have urged that, even if the territorial grant should be held to be a valid contract of tax immunity, nevertheless, because Hamline failed for a period of more than 11 years to maintain and conduct its corporate functions as an educational institution, it should "as a matter of law" be held to have "forfeited" its "privilege to exemption from taxation," "regardless of the cause of the suspension"; and further, inasmuch as Hamline has thus failed, that the consideration for the grant has likewise failed.

As to the necessity of consideration to sustain a contract such as this, we see no need of much discussion. It is as necessary for this one as for other contractual engagements. In this case, however, the trial court found, upon adequate evidence, that Hamline's trustees have consistently, through all the difficult years of its early history, made real and effective efforts to build and maintain a worth-while college, and that the tangible results of these efforts have been "large contributions" from private sources; that the college has carried a heavy teaching load and rendered a service to the state which otherwise the state would in most cases have been required to perform at heavy expense; that the institution has furnished "a consideration more than adequate" to balance the advantages granted by the statutory exemption; "and said contract has been and is a favorable one" to the state.

We should bear in mind that, while the work of educational institutions such as Hamline is primarily for the advantage of the individuals educated there, it ultimately redounds to the public good. The function of such institutions is largely public, and their property is devoted "not to private gain to individuals, but to a beneficent use—the education and enlightenment of the citizen." State v. Bishop Seabury Mission, 90 Minn. 92, 97, 95 N. W. 882, 883. The decisions of the United States Supreme Court in Home of the Friendless v. Rouse, 75 U. S. (Wall.) 430, 19 L. ed. 495, and Washington University v. Rouse, 75 U. S. (Wall.) 439, 19 L. ed. 498, hold directly and clearly that grants of tax immunity of the type here involved are protected by the federal constitution. In the Home of the Friendless case, the court said (75 U. S. [Wall.] 437, 19 L. ed. 497):

"There is no necessity of looking for the consideration for a legislative contract outside of the objects for which the corporation was created. These objects were deemed by the legislature to be beneficial to the community, and this benefit constitutes the consideration for the contract, and no other is required to support it."

■ Nor do we believe that the record justifies the state's assertion that "as a matter of law" Hamline has abandoned its charter rights. The findings specifically negate that claim. Our opinion in Trustees of Pillsbury Academy v. State, 204 Minn. 365, 283 N. W. 727, is cited by counsel as their authority. True, there is language in that opinion casting doubt upon many of our prior cases, such as County of Nobles v. Hamline University, 46 Minn. 316, 48 N. W. 1119; State v. Bishop Seabury Mission, 90 Minn. 92, 95 N. W. 882; and State v. W. L. Harris Realty Co. 148 Minn. 20, 180 N. W. 776, wherein this court held and gave effect to grants of tax immunity to institutions of Hamline's class. But a careful reading of the Pillsbury case will disclose that the only basis upon which the opinion was founded was that Minnesota Central University, created by and granted immunity from taxation under L. 1854, c. 36, of the territory "was not continued in existence" by Sp. L. 1878, c. 69, since, under the later

act, "a new corporation, now Pillsbury Academy, was created." Therefore, it was said, the 1878 act (204 Minn. 366, 283 N. W. 728), purporting "to grant to the new corporation an immunity from taxation of all its property, of whatever kind and however used, was unconstitutional under Minn. Const. art. 9, §§ 1 and 3, as it then stood." We also said (204 Minn. 375, 283 N. W. 732), "before 1867, there had been a complete abandonment of its project by the Minnesota Central University. For that very reason, all its property was transferred unconditionally to the 'Baptist Centennial Committee of the State of Minnesota,'" and (204 Minn. 376, 283 N. W. 732) "the abandonment of its project by the Minnesota Central University made its exemption repealable and repealed"; hence the "immunity was defunct—had been for ten years in 1878" when the new corporation was created. The question here presented was discreetly left open, the court saying (204 Minn. 374-375, 283 N. W. 732), "We pass that point without decision * * * because it has not been argued."

Abandonment of such a right as was given to Hamline by the representatives of the people should not be lightly assumed. The suspension of its teaching function could not well be said to be a surrender of its charter rights. The suspension was not a voluntary one; rather, it was caused by forces beyond the control of any human agency. In this connection, it is interesting to note that our state university was created by L. 1851, c. 3, of the territory. It was given a grant of 46,000 acres. In addition, it had for its support the state's power to tax. Yet from the time of its creation until 1869 no college department was opened. There were only two graduates at its first commencement in 1873. (See *Forty Years of the University of Minnesota* by E. Bird Johnson, pp. 17-31.) In the opinion of Dr. Folwell, president of the university from 1869 to 1884 (*4 Folwell's History of Minnesota*, p. 60, *et seq.*), the history of the university from 1851 to 1868 was "mostly a pitiful story of how, as the result of a series of errors and blunders, next to nothing was accomplished and a great debt accumulated."

During these same years Hamline was actually functioning in both its preparatory and college departments. As we have already noted, it was the only school of college rank from the time of its creation to and including 1869. During that period it rendered valuable service to the state in that some 200 of its graduates were teaching in the public schools of the state.

We think the evidence sustains the findings that there was neither abandonment nor surrender of the grant.

■ The adoption of the state constitution, upon which reliance is placed for the present claim of right to tax Hamline's property, could not change its granted rights if these were contractual obligations. This seems clear, since our constitution was adopted in 1857, when Hamline was functioning in full compliance with its charter obligations. Perry v. United States, 294 U. S. 330, 55 S. Ct. 432, 79 L. ed. 912, 918-919, 95 A. L. R. 1335.

■ In State ex rel. Hahn v. Minnesota Central Ry. Co. 36 Minn. 246, 258, 30 N. W. 816, 817, a *quo warranto* proceeding brought by the attorney general against certain railway companies to have their charters forfeited for failure to comply with certain legal requirements claimed to have been violated, we said:

"* * * the general rule is that a corporation is not to be deemed dissolved until a forfeiture is judicially ascertained and adjudged [citing cases] and a cause of forfeiture can only be taken advantage of by the state in a direct proceeding for the purpose."

So also in Richards v. Minnesota Sav. Bank, 75 Minn. 196, 204, 205, 77 N. W. 822, 823, 824, we held:

"* * * in the absence of any action on the part of the state, a surrender or abandonment of its corporate franchise, and an acceptance thereof by the state, cannot be presumed from its transfer of its property and continued nonuser of its franchise. It remained an inactive corporation, and had the right to resume the exercise of its franchise * * * unless the state interfered." And, notwithstanding the fact that this was a savings bank which for 16 years had not used its corporate franchise, we said: "It did not do any

act which incapacitated it, or rendered it legally impossible, to resume business."

■ Not to be overlooked is a legislative enactment dating back to territorial days authorizing the attorney general "in the name of the state to vacate the charter or annul the existence of a corporation" whenever it violates its corporate powers. Pub. Stat. 1849-1858, c. 70, § 3, now found as above quoted in Minn. St. 1941, § 556.07 (Mason St. 1927, § 9710). Significant is this direction:

*"The attorney general shall bring action in every case of public interest,* whenever he has reason to believe that any of these acts or omissions can be proved." (Italics supplied.)

Since no proceeding of any kind has ever been brought by the state's highest legal enforcement officer against Hamline, we may safely assume that it has traveled the straight and narrow path of corporate rectitude. Add to this the fact that there has been no legislation, not even since the 1906 wide-open tax amendment (*cf.* Reed v. Bjornson, 191 Minn. 254, pp. 258-259, 253 N. W. 102, 104-105), tending to limit or in any way affecting Hamline's charter grant of immunity, and we can see no compelling reason on this score for overturning the decisions of the triers of fact.

■ Counsel in the Ramsey county case (No. 33533) think that the trial court was led into error, to the county's loss, because the court felt that it was bound by County of Nobles v. Hamline University, 46 Minn. 316, 48 N. W. 1119, *supra.* We are urged to reëxamine that decision because that "case is not sound and should not now be followed"; that it "was not adequately considered" by this court, since the sole basis for the result reached was founded upon First Div. St. P. & P. R. Co. v. Parcher, 14 Minn. 224 (297), a case which is said to be "not an authority for the proposition raised in the Nobles County case and that anything said therein pertaining to the subject [tax immunity] was dictum." The opinion in that case was written by Mr. Justice Berry more than 60 years ago. That the court gave the case careful consideration is abundantly shown if one will take the time carefully to review what was

there decided. We refrain from quoting from it, since the opinion is available to both bench and bar. We have read and reread the opinion, and we freely confess that we are favorably impressed with it.

In the Nobles county case the opinion, written by Mr. Justice Mitchell, bears date June 8, 1891. It has stood the test of time for nearly 53 years. Are we now to discard it? Justice Mitchell's name and fame forbid the thought that he overlooked the vital questions there presented. They were the same as those here involved, except that in this case Hamline has urged as an additional reason for affirmance the doctrine of *res judicata* of what was there determined.

That case was followed in State v. W. L. Harris Realty Co. 148 Minn. 20, 180 N. W. 776, where the same exemption as that involved in the Nobles county case was again questioned and again sustained. The opinion, written by Mr. Chief Justice Brown, was filed January 7, 1921, more than 23 years ago. From that time until now no case has come before us challenging these decisions.

In State v. Bishop Seabury Mission, 90 Minn. 96, 95 N. W. 883, we said:

"It has been the policy of our people, from the organization of the territory to the present time, to encourage and by all proper means assist in the support and maintenance of educational institutions. Such was the policy of the federal government prior to the organization of the state, for it was enacted by article 3, Ordinance of 1787, providing for the government of the Northwest Territory, of which Minnesota formed a part, that 'religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.' "

And in construing the constitution it was said (90 Minn. 97, 95 N. W. 883):

"* * * the spirit of the times when it was adopted, as shown by the attitude of the territorial legislature and the people, should be

infused into it, and reasons of practicability and effectiveness, so far as consistent with the usual canons of construction, applied in determining its purpose and meaning."

The "encouragement" to be given such institutions "ought not to be limited to mere formal acts of recognition or praise on the part of the state or people, but to broad acts of such potentiality as will result in substantial benefit and assistance to them."

We should not be "unmindful of the desirability of continuity of decision in constitutional questions." Only "when convinced of former error" should we overrule a line of decision law of many years' standing. Smith v. Allwright, 321 U. S. 649, 665, 64 S. Ct. 757, 765. In the words of Mr. Justice Roberts in his dissent (321 U. S. 666, 64 S. Ct. 766), we should be careful not to permit "intolerance for what those who have composed this court in the past have conscientiously and deliberately concluded," nor should we indulge in "an assumption that knowledge and wisdom reside in us which was denied to our predecessors."

Mindful of these principles, we conclude that we should follow our former cases, not overrule them.

We have not overlooked Trustees of Phillips Exeter Academy v. Exeter, 90 N. H. 472, 11 A. (2d) 569. (See also 27 A. [2d] 569.) The question there presented and decided was whether the general assembly in 1781, before New Hampshire became a state and before our national constitution was adopted, could grant a perpetual exemption from taxation. There the grant was declared void because the assembly granting it was only a delegated agency and for that reason could not enact irrevocable laws. Our case is founded upon an entirely different base. Here there was a grant by the representatives of the people under the powers conferred by the federal government. In addition, the people of the state, in adopting their constitution, recognized and assumed the validity of all existing contract obligations and rights created thereby.

■ A case having an important bearing upon the question of the power of a territorial legislature to enact legislation of the type here presented is Board of Trustees for Vincennes University

v. State of Indiana, 55 U. S. (How.) 268, 14 L. ed. 416. It was decided in 1852, two years before Hamline's charter was granted and five years before we adopted our constitution. As such, it is a conspicuously opportune expression of a clearly contemporaneous interpretation on this phase of the law as determined by our court of last resort. The following quotation from that opinion is deemed appropriate (55 U. S. [How.] 273, 14 L. ed. 418):

"Under the ordinance, the legislature of the territory was vested with general legislative powers, restricted only by the articles contained in that instrument. It had power to grant an act of incorporation, with all the functions necessary to effectuate its objects. There can be no question, therefore, that the corporate powers vested in the plaintiffs, by the legislature of the territory, were legitimately conferred. And these powers were not affected, and could not be affected by the constitution of the State. It provided that 'all rights, contracts, and claims, both as respects individuals and bodies corporate, shall continue as if no change had taken place in this government.' "

We think that what the court there decided well fits the facts found by the trial courts in these cases. Here, as in the cited case, there was a broad grant of power given our territorial legislature by the national government, extending "to all rightful subjects of legislation." There is no suggestion that congress "disapproved" our legislation. And here too, as in that case, under § 1 of the "Schedule" of our constitution, our people solemnly "declared that all rights, actions, prosecutions, judgments, claims and contracts, as well of individuals as of bodies corporate, shall continue as if no change had taken place." The creation of Hamline, with all the functions necessary to effectuate its objects, was well within the power vested in the territorial legislature by the federal act.

It follows that there should be an affirmance in each case.

So ordered.